Uott, J.,
delivered the opinion of the court:
The legislative policy of the Government is the key to the interpretation of the Bowman Act. When that measure was first brought before Congress the bill contained only the first two sections of the act, and allowed either House or any committee to send to this court any claim which required the taking of evidence or involved the determination of facts. But Congress, being unwilling to grant such unlimited discretion, ingrafted upon the bill the restrictive amendments that now form the third and fourth sections.
The third section of the act is wholly in restraint of jurisdic- *231 tiou, and the first restriction imposed is that the jurisdiction of the court shall not extend to claims “growing out of the destruction or damage to property by the Army or Navy during the war for the suppression of the rebellion.” At this point, in the judgment of the court, the first restriction ends. Such was the law beforé the passage of the Bowman Act, and such has been the policy of the Government since the Act 4th July, 1864 (13 Stat. L., 381). Personal property used lias been regarded as a fit subject for payment; no property injured or ■destroyed has been paid for, except, perhaps, in the case of religious or charitable institutions. The restriction as it stands agrees with the general policy of the Government. It is true that the clause quoted is separated from what follows only by a comma, but nevertheless the language indicates that the ■clauses are as distinct as if they were several sections. The third section, therefore, contains three distinct provisions:
(1) That the jurisdiction of the court shall not extend to any claim “growing out of the destruction or damage to property by the Army or Navy during the toar for the suppression of the rebellion.”
(2) That the jurisdiction of the court shall not extend to any claim “for the use and occupation of real estate by any part of the military or naval forces of the United States in the operations of ■saidf orees during the said war at the seat of war.”
(3) That the jurisdiction of the court shall not extend to any claim “ which is now barred by virtue of the provisions of any la/w of the United States.”
The first provision is governed by the phrase '•'■growing out off and is not qualified by the remote clause at the end of the second restriction, “ the seat of war; ” the second is governed by the preposition “for” and is qualified by the clauses uin the operations of said forces,” 11 at the seat of war.” The former is not restricted to any kind of property, nor limited to anyplace, but embraces all property, real or personal, whether situated on loyal or hostile territory. The latter is restricted and qualified, and its interpretation is now the subject of consideration.
It .is to be noted that this second provision of the third section relates exclusively to real property, and that the denial of jurisdiction is qualified and limited. The purpose of Congress manifestly was not to repudiate every idea of obligation for real property used or occupied by the Army or Navy during *232 the civil war, but to exclude from jurisdiction a more limited class of cases; that is to say, cases where the use and occupation lay uin the operation ” of the military and naval forces “ at the seat of war.” Both phrases are new in bur statute law, and their meanings undefined. Though unusually simple in form they have caused unusual perplexity in their practical application, no two of the numerous eouusel who have addressed the court agreeing as to the effect that should be given to them. One thing only is certain, that they are clauses of qualification and limitation.
The Act 4cth July, 1864 (13 Stat. L., 381), the act establishing the Southern Claims Commission (16 Stat. L., 625), and substantially all acts of Congress dealing with claims and compensation have drawn a line at States in rebellion and States not in rebellion, and have regarded the territory of the former as hostile territory during the war and all persons therein as enemies with an exception in favor of those persons who could show that they loyally adhered to the Government of the United States. Out of this generally hostile territory was carved, by the Proclamation 1st July, 1862 (12 Stat. L., 1266), a territory consisting of thirty-nine counties in Virginia, which subsequently became the larger part of the new State of West Virginia. These thirty-nine counties were never declared in insurrection either by proclamation or by statute, and from first to last must be regarded as loyal territory. Besides them, the new State when admitted by the West Virginia Admission Act 31si December, 1862 (12 Stat. L., 633), and the proclamation 20th April, 1863, contained nine other counties, and to these were subsequently added two more, Berkeley and Jefferson, by the Aet 10th March, 1866 (14 Stat. L., 350), and the Joint Mesolution, 18th June, 1866 (ib., 360). There were therefore three kinds of territory in this single State; territory never declared in rebellion; territory declared hostile at the beginning but taken out of the operation of the proclamation and made loyal by the admission of the State in 1863; territory which continued hostile through the war, but- which became a part of the State at the close Of hostilities, and was treated as having been loyal by legislation in 1866.
Besides these counties of West Virginia were certain parishes of Louisiana which may occasion doubts. They were declared hostile territory by the proclamation 1st July, 1862; but sub *233 sequent proclamations exceptad them from the remainder of the State and treated them as loyal, it is believed that there was no statute lite the West Virginia and Tennessee acts, which affected their status, and that their change from hostile to friendly and from friendly to hostile depends entirely upon Executive proclamations.
But there was still another kind of territory which has already been a subject of consideration: a narrow strip of Virginia, embracing the towns of Alexandria and Norfolk, which was declared in insurrection, but which almost immediately .was recovered by the forces of the Government. The peculiarity of its status is that within it sat the recognized loyal government of Virginia, the only government which consented to the cession of West Virginia, and that, each of the Houses of Congress recognized it as loyal territory by the admission of Senators and Representatives as early as July, 1861.
Again, we have-the State of Tennessee, which was not, included as one of the States in rebellion by the President in the emancipation proclamation, January 1, 1863, and which was subsequently treated as loyal territory by Congress in the Act 28th July, 1866 (14 Stat. L., 370), extending the benefits of the. act 4th July, 1864, “to the loyal citizens of the State of Tennessee.”
Thus it will be seen and must be confessed that at no time during the war of the rebellion was there a fixed and settled geographical line on the one side of which lay loyal and on the other side of which lay Hostile territory. Furthermore, it must be remelnbered that actual hostilities were not exclusively within the Southern States, but that contending armiesmarched and fought within the confines of States never in rebellion, and that the varying seat of war extended in fact, if not in contemplation of the statute, from Gettysburg to Brownsville.
The legislation of Congress concerning personal property, for which compensation has been authorized, also refrained from drawing a territorial line. The Act Ath July, 1864 (13 Stat. L., 381), authorizes the Quartermaster and Commissary Generals to investigate claims for “stores and supplies” “of loyal citizens in States not in rebellion.” The joint resolution 18th June, 1866 (supra) added the counties of Berkeley and Jefferson; and the Act 28th July, 1866 (14 Stat. L., 370), the State of Tennessee. The Act 21st February, 1867 (14 Stat. L., *234 397), curtailed the jurisdiction by providing that the act 4th July, 1864, “should not be construed to authorize the settlement of any claim for supplies or stores” which “originated” in a State or part of a State declared in rebellion by the .proclamation 1st July, 1862; and it adds, though the act 4th July, 1864, did not refer to real property, “nor [claims] for the occupation of or injury to real estate.” But the act excepted the States of Tennessee and West Virginia from its restrictions.
This was the condition of the statute law when the Southern Claims Commission was created by the Act 3d March, 1871 (16 Stat. L., § 2, p. 624). That is to say, a remedy existed for quarter-. master and commissary stores and supplies if the claimants lived and the claims “originated” in the loyal States, includiny West Virginia or Tennessee; hut no remedy existed for engineers and medical stores and supplies, nor for real property.
The jurisdiction of the Southern Claims Commission extended territorially to “States proclaimed as in insurrection,” and the subject-matter was “stores or supplies taken or furnished” “ for the use of the Army.” Its territory, therefore, overlapped that of the Quartermaster and Commissary Generals; and the commissioners very properly held that the term “stores or supplies” “for the. use of the Army” included those of the engineer and medical departments. Thus for the inhabitants of States declared in insurrection a remedy was given for every kind of army stores or supplies, while the inhabitants of loyal States who had furnished engineer and medical supplies were left without remedy. If one-half of a pile of lumber in Maryland or Pennsylvania was taken by a quartermaster to build barracks for troops, the owner might take his claim to the Quartermaster-General for settlement; but if the other half was taken by an engineer to build another kind of shelter for the same troops the owner had no remedy, and, save by a special act of Congress, could obtain no redress.
But in addition to these incongruities the Bowman Act has itself added another. It may be conceded that Congress have discriminated in favor of one land of property, personal, and against another, real; but it cannot be supposed that Congress intended to discriminate between the owners of different kinds of property. Still less can it be supposed that while Congress discriminated in favor of personal property they would at the same time have discriminated in favor of the owners of real *235 property. Now, the fourth section of the Bowman Act relates to stores and supplies — to personal property; and it requires in such cases proof of loyalty. Furthermore, it declares that “ loyalty shall be a jurisdictional fact f7 furthermore, it requires that this jurisdictional fact of loyalty shall be found “on a preliminary inquiry;” furthermore, it prescribes that if loyalty be not found the case “shall, without further proceedings, be dismissed.” And these provisions agree with all previous legislation on the subject, the only difference being that they are moi e particular, searching, and stringent. But while such has been the invariable legislation of Congress concerning personal property, that provision of the third section which relates exclusively to real property is absolutely silent as to the loyalty of the claimant, and imposes upon the right of action no condition of allegiance whatever.
It is well-nigh needless to add that this provision of the third section, if taken literally and applied indiscriminately, is incongruous with all previous legislation on the subject of claims for property used in the insurrectionary districts, and inconsistent with the principles governing national obligations that have been generally enunciated in the halls of legislation or on the bench of the judiciary; and with no legislation is it more incongruous and inconsistent, (if so taken and applied) than with the, section which immediately follows it. Indeed it may be doubted whether any member of Congress, either from the North or the South, even in the warmth and inconsiderateness of debate, ever asserted a liability on the part of the Government for real property occupied and used in hostile territory, save in cases where the owner had been a loyal citizen of the United States, or of the premises procured on the faith of an express agreement.
It will therefore be again seen how exceedingly difficult it is to say what was the intent of the framers of the statute when they used this phrase, “the seat of war;” or to determine within the legislative intent whether the confines of the seat of war were fixed or variable; and whether its status was permanent or temporary.
It only remains to be noted as expressive of the actual practice of the Government that during the war rent was paid in some cases by authority of the War Department (Provinces Case, 5 C. Cls. R., 455; 3 id., 76; Letters from Quartermaster- *236 General Meigs, Law of Claims, 250), and that since tbe war eleven private acts have been passed, from time to time, for the relief of owners of real property, two of whom will be found to be charitable institutions, one a person whose property was occupied under an express contract; three persons whose claims were post helium, i. e., whose property was occupied subsequent to the cessation of hostilities; two the owners of property lying within the narrow, strip of Virginia before referred to, which was controlled by the loyal legislature of that State; one the owner of property in Tennessee, and that only.two were compensated for the use and occupation of real property during the war in what was indisputably hostile territory. But all of these may be classed and characterized as exceptional, and the legislation in regard to these exceptional cases shows the solicitude with which Congress have abstained from settling a general policy, and the care with which they have left the question open and the liability undefined.
Tbe principles by which the legislative policy has been conducted, and which Congress have recognized, may be summarized as follows:
1. The civil war, under the decisions of the Supreme Court, is to be regarded generally as an international war, that is to say, every person in States declared in insurrection became the enemy of every person in States not in ^insurrection, and the territory on one side of the line was stamped as hostile territory, while that on the other remained national. So far as the constitutional obligations of the Government were involved, the citizens of the seceded States entered into a condition of temporary alienage, in which the Government was bound to them by no other obligations than those which would exist in favor of actual aliens in a case of international war. But inasmuch as this was a civil war, an exception was in-grafted upon the general rule by legislation in favor of those persons who, necessarily dwelling upon hostile territory, nevertheless refrained from becoming citizens of the de facto Government, and who by faithfully adhering to the Government of the United States retained so far as they could their citizenship and escaped si> far as they could the condition of temporary alienage. As to such persons the legislative authority of the nation has said in various ways through different statutes: You have maintained your part of the constitutional obliga *237 Con, and the Government will maintain its. Notwithstanding your residence on hostile territory, and notwithstanding- the ordinary presumption that all persons voluntarily residing there were for the time being public enemies, we will, on proof of your allegiance to the United States, regard you as citizens and not aliens. As such you will be entitled to the same compensation for property taken for public úse which the Constitution assures to all other citizens.
But as to those persons who did not adhere to the United States, Congress have never assumed or created a liability. Their rights were simply what they would have been if the rebellion had been an international war and they had been citizens of a belligerent power; and it must be conceded that if such had been the fact public law would have cast no obligation upon the United States for private property taken by its invading forces, except where the property was procured upon the faith of assurances which gave to the user or the occupancy the character of an express contract. We must, therefore, conclude that no obligation can be imputed to the Government to pay for property taken or used on hostile territory, except where a statute provides that the allegiance of the owner during hostilities may be established, or where the property was obtained under an express contract made by competent authority ; and we must also conclude that where no obligation is cast upon the Government, either by public or statute law, no committee of Congress has authority to confer upon this court jurisdiction of claims for property, real or personal, taken or used in the civil war.
2. The Constitution makes no distinction between real and personal property taken for public use, nor do the decisions of the Supreme Court. The same obligation applies to both-. But there is a distinction to be drawn between property used for Government purposes and property destroyed for the public safety. If the conditions admitted of the property being acquired by contract and of being used for the benefit of the Government, the obligation attaches, and it must be regarded as'acquired under.an implied contract; but if the taking,! using, or occupying was in the nature of destruction for the general welfare or incident to the inevitable ravages of war, such as the march of troops, the conflict of armies, the destruction _o¿supplies, and whether brought about by casualty *238 or authority, and whether on hostil^oi^national territory, the loss, in the absence of'positive legislation,’must be borne by him on whom itfalls, and no obligation to pay can be imputed to the Government.*
3. Since the decisions of the Supreme Court in Rose v. Himely (4 Cranch, 272) and Luther v. Borden (7 How., 42), it has hardly been questioned that in all matters which involve our relations with foreign powers, or the extent and existence of national territory, or the internal polity of our State governments, the judiciary must recognize the condition of affairs which is recognized by the political branches of the Government. Hence the court in determining what is hostile and what is not hostile territory must be guided by the action of Congress and the proclamations of the Executive. The responsibility of declaring what portions of the country were in in- _ surrection and of declaring when the insurrection came to an end was accorded to the President; when he declared a portion of the country to be in insurrection the judiciary cannot try the issue and find the territory national; conversely, when the President declared the insurrection at an end in any portion of the country, the judiciary cannot try the issue and find the territory hostile. For in view of the fact that the third section recognizes real property used and occupied by the Army as a subject for relief, yet makes no provision for ascertaining the continued allegiance of the owner as a citizen of the United States, such as is made by the fourth section for the owners of personal property, but on the contrary substitutes this new phrase, “ at tho seat of war,” we must hold that in the contemplation of Congress when they framed the section, “the seat of war” meant all hostile territory which the Army or Navy were endeavoring to enter and occupy.
*239 And these conclusions lead to the following- practical results:
The court is prohibited from exercising jurisdiction of cases transmitted under the first section of the Bowman Act in the following instances :
1. Of cases within the general or special jurisdictions of this court which were prosecuted to judgment and determined upon ' the merits. (Ltev. Stat., § § 1092, 1093.)
2. Of cases within the general jurisdiction of the court which, if now- prosecuted therein, would be barred by'the statute of limitations. (Rev. Stat., § 1069.)
3. Of cases which might have been prosecuted under the Abandoned or Captured Property Act, but which the claimant neglected to prosecute while the jurisdictional period for bringing such suits continued. (Ford’s Case, 19 C. Cls. R., 519.)
4. Of cases for military stores and supplies which might have been presented to the Southern Claims Commission, but which are barred by the statutes creating or continuing that tribunal (17 Stat. L., § 2, p. 577 ; 19 id., 404; 20 id., § 5, p. 550), or which might have been presented to the Quartermaster and Commissary Generals .under the Act 4th July 1864, (13 Stat. L., 381), hut which are barred by the Act 3d March, 1879 (20 id., § 3, p. 628; Dodd’s Case, present term).
5. Of cases growing out of the destruction of or damage to property, real or personal, by the Army or Navy, wherever situated, whether in States in insurrection or in States not in insurrection, and whether on territory which was loyal or on territory which was hostile, and whether by the depredation of soldiers or the authority of officers, it being understood that this applies to all property where the taking, user, or occupancy was incident to the ravages of war and worked no benefit or saving to the Government from which a contract ought in equity and good conscience to be implied. •
6. Of cases for the use and occupation of real property by the military and naval forces of the United States whereat the time of user and occupancy the'territory was hostile, that is to say, where at the time of user and occupancy the Army was operating, in the judgment of the President, in enemy’s country, and no means being authorized by the statute for ascertaining whether the owner adhered to the United States or to their enemies, no obligation of contract arises or can be implied.
*240 7. Of cases for the use and occupation of real property on loyal territory where the user or occupancy was caused by battles or marches, or was transitory in its nature and incident to the movement and operation of hostile forces, and was not for the prolonged camping, housing, or dwelling of troops.
The order of the court is that the objections of the defendants to the jurisdiction of the court be overruled, and that the findings of fact in the case be certified to the Committee on War Claims of the House of Iiepreseutaiives.

 The distinction between the two classes of cases where a contract can be implied and cannot be implied is admirably stated by Mr. Lawrence in his report, February 10, 187Ó, entitled The Law of Claims, 279: (1) Cases for the use and occupation of buildings and grounds where the occupation was voluntary and the result of-choice, superinduced by no overruling military necessity. (2) Cases where, the occupancy was temporary, imposed by overruling necessity — an occupancy continued only during the actual existence of such impending necessity, or the application of materials to purposes of defense in an emergency.