Nott, J.,
delivered the opinion of the court:
The military occupation of Tennessee began with the beginning of the year 1862, and the advance of the Union forces was continuous and rapid, extending through the most populous portion of the State to its extreme southwestern border. The permanent occupation of Nashville dates from the 25th of February, and that of Memphis from the 6th of June.
Before the military occupation of the State was complete a great number of refugees passed over into Kentucky and enlisted in Union regiments forming there. This number the adjutant-general of Tennessee, in his report for 1866, computes to be about 7,000. Within the State there were raised and organized thirty-two regiments of cavalry and infantry and five batteries of light artillery, containing, according to the rolls of the War Department, 31,092 white troops. We may therefore conclude that the number of white troops furnished by the State of Tennessee was, in round numbers, not far from 38,000.
Butthemagnitude of this contribution to the volunteer forces of the United States will be best appreciated by comparison :
Tennessee contributed more white troops than either New Hampshire (33,937), West Virginia (32,068), or Vermont (33,288); nearly twice as many as either Kansas (20,149), Rhode Island (23,236), or Minnesota (24,020); more than twice as many as either California (15,725) or the District of Columbia (16,534); about three times as many as Delaware (12,284); about four times as many as Arkansas (8,289); about seven times as many ■ as Louisiana (5,224), and more than Alabama (2,556), Arkansas (8,289), Colorado (4,903), Florida (1,290), Georgia (00), Louisi *242 ana (5,224), Mississippi (524), Nebraska (2,175), Nevada (1,080), North Carolina (3,156), Oregon (1,810), South Carolina (00), Texas (1,965), Dakota (206), Virginia (00), Indian Territory (3,530), and Washington Territory (964) all put together.
If the aid which the State gave to the Union had begun earlier or later, it might not have received the extraordinary appreciation which was accorded to it; but its coming was during the disastrous campaign of 1862, when the resources of the Northern States were strained to the utmost, when the siege of Richmond was abandoned, and the State of Maryland was invaded, and the bloody fields of the Seven Days’ battles, the second Bull Run, Shiloh, and Antietam lay fresh before the public gaze.
On the 22d September, 1862, the President issued the proclamation which announced that on the 1st January ensuing he would “ by proclamation designate the States, and parts of States, if any, in which the people thereof, respectively, shall then be in rebellion,” and the proclamation likewise declared: ‘‘That on the 1st day of January, in the year of our Lord one thousand eight hundred and sixty-three, all persons held as slaves within any State or designated part of a State, the people whereof shall then be in rebellion against the United States, shall be then, thenceforward, and forever free.”
On the 1st January, 1863, the President issued the proclamation of emancipation, wherein herecited the provisions above referred to of the preceding proclamation, and declared that in accordance with his purpose ‘‘ publicly proclaimed for the full period of one hundred days ” he did “ order and designate as the States and parts of States wherein the people thereof, respectively, are this day in rebellion against the United States the following,” and Tennessee was not one of them.
Such being the action of the Executive concerning the State of Tennessee, we now pass to the legislative. It will be found set forth in the statutes enumerated in the case just decided (Heflebower). Briefly stated it was this : Congress by the act of 4th July, 1864, provided a remedy for the exclusive benefit of the loyal citizens of the loyal States, the language of the act being “States not in rebellion.” By the act 28th July, 1866, Congress extended the benefits of the act 4th July, 1864, “ to the loyal citizens of the State of Tennessee.” From that *243 moment, therefore, the citizens of Tennessee, loyal and disloyal, so far as claims for personal property were involved, stood upon precisely the same footing as the citizens of States never in rebellion. In 1867 this action of the legislative branch of the Government was rendered still more expressive by a provision attached to the Aet 21st February, 1867 (14 Stat. L., 397), which forbade the settlement of claims that had “ originated” in States or parts of States declared in rebellion by the proclamation, 1st July, 1862, but which added the significant declaration, “ that nothing herein contained shall repeal or modify ” the previous action of Congress in favor of the State of Tennessee. The purpose of the act 1867, therefore, was to restrict the benefits of the act 1864 to cases where both the claimant and the claim came from a loyal State; and the effect was to declare that a claim which had orignated in the State of Tennessee should be regarded, so far as’ the act 1864 was involved, as a claim which had “ originated ” in a loyal State.
Upon this executive and legislative action, and for the reasons set forth in Heflebower’s Case (just decided), of which.this is a sequel, the court bases its conclusion that on the 1st January, 1863, the State of Tennessee ceased to be hostile territory, and from that time cannot be regarded as tiie seat of war within the meaning of the third section of the Bowman Act.
The order of the court is that the defendants’ motion to dismiss .the petition for want of jurisdiction be overruled.