Nott, J.,
delivered the opinion of the court:
This case was transmitted to the court by the Committee on War Claims of the House of Representatives under the provisions of the Bowman Act, § 1. The claim is for the military occupation of real property in the city of Memphis, the entry or seizure having been made immediately after the capture of the city. By the fourth section of the act the court is inhibited from exercising jurisdiction of claims for the'occupation of real property at the seat of war, and the first question in the case is whether jurisdiction can be entertained under that act by virtue of which the case has come into this court. That question is answered by the decisions in the cases of Hefflebower (21 C. Cls. R., 228); Neal (ib., 240), and the Overton Hotel Co. (23 id., 186). The occupation of the property for military purposes began before January 1,1803, while the State of Tennessee was hostile territory and the city of Memphis “the seat of war” within the meaning of the act as interpreted by those decisions.
But the counsel for the claimant has rested the casé upon another statutory provision, which hitherto seems to have escaped the attention of the bar, and certainly has not received a construction from the court.
Concerning cases transmitted to this court under the Bowman Act, 1883, the thirteenth section of the Act 3d March, 1887 (24 Stat., L., p. 505) provides:
“ If it shall appear to the satisfaction of the court, upon the facts established, that it has jurisdiction to render judgment or decree thereon under existing laws or under the provisions of this act, it shall proceed to do so, giving to either party such further opportunity for hearing as in its judgment justice shall require.”
Instead of restricting its action to the functions of a jury and finding the facts in the form of a special verdict for the action of Congress, the court is required by the statute-to act judicially, and determine the legal rights of the parties in a final judgment.
In the present case the claimant alleges that the cause of action is one of which the court has jurisdiction irrespective of the Bowman. Act, and he asks for judgment. The question of this jurisdiction thus invoked “ upon the facts established ” is therefore the fundamental question to be determined.
*233 The court is of the opinion that this provision of the statute is mandatory, and that due effect must be given to it in every case transmitted under the Bowman Act which presents a cause of action upon which a final judgment can be rendered. And the court is also of the opinion that the application of the statute does not depend upon the consent of parties. The accompanying provision, which directs that there shall be given “ to either party such further opportunity for hearing as justice shall require,” clearly casts upon the court the duty of enforcing the mandate of the statute whether it be invoked or not.
The relations of Congress and this court concerning claims are now much like those which exist, or once existed, between courts of -equity and courts of law. If it be necessary in equity to determine contested facts in certain cases, the court will frame issues and send them to a court of law to be tried by a jury. Such, in effect, is the remedy provided by the Bowman Act. Either of the Houses of Congress or one of its committees can send a claim for — what is equivalent to a verdict of a jury — a finding of the facts upon issues joined and regularly tried, after which the claim will go back to Congress for such relief as the legislative authority may deem legal, just, or equitable.
Again, a suitor can not go into equity for relief if he has a remedy at law. That principle seems engrafted on the system by this provision of the Tucker Act. If the case be one which might have been brought in a legal tribunal, the intimation of the statute is that the claimant should have asserted his legal rights there, and that Congress shall not be troubled further with tlm claim. It follows that the claimant must stand or fall with his legal rights ; that the relief of the one party must be restricted to the obligations of the other; that the■ damages can not be discretionary, as in Congress, and that there can be no relief for the claimant until he has established like other plaintiff's in other cases a legal liability on the part of the defendants.
What, then, are the jurisdictional facts of this case considered as an action at law? That is to say, what is this cause of action, considered as one which may be merged into and determined by a final judgment ?
*234 The suit is for an implied rent growing out of the use and occupation of a building in Memphis by the Quartermaster Department as a hospital from June 15, 1862, to September 15, 1865. The alleged owner was a married woman, residing in Memphis ; her husband was within the Confederate lines, bearing arms against the United States. Whether the wife, the .alleged owner, was loyal, is a question in the case which as a matter of fact the court determines adversely to her by finding that she did not at all times bear true allegiance to the United States. Whether, if this be considered as an action at law for the prosecution of a legal right, the judiciary must nevertheless regard her as loyal under the decision of the Supreme Court in Klein’s Case (13 Wall. R., 128) by virtue of the general amnesty proclamation, December 25,1868, is a question which need not at present be discussed. During the period of occupancy the Government paid rent for buildings occupied for military purposes in some cases, but not in all. As appears in Provine’s Case (5 C. Cls. R., 455), they were borne upon the local quartermaster’s abstracts and reports; the allowance of rent was by order of the commanding officer; it was approved,- apparently, by the Quartermaster General, and the accounts were audited and paid at the Treasury. The policy of the Government there, so far as it can be deemed a policy, was thus stated by Colonel Clary, the deputy quartermaster-general in charge, in a report made to the Quartermaster-General, bearing date December 28, 1865:
“ The payment of rent on buildings seized for public purposes on the capture of Memphis was originally determined upon and ordered by the military commander of the district upon proof of the loyalty of the owners.” (Provine’s Case, 5 C. Cls. R., 455, 459.)
But in the case now before us the military commander of the district did not order the payment of rent until the 14th September, 1805, and the Quartermaster-General disapproved the payment of rent for the previous occupancy. There is evidence which indicates that if the owner could have earlier produced her deed she would have been paid sooner for the use of the building, and it is argued that the refusal to allow rent until evidence of title should be produced indicates an intent to recognize the title of the owner and negatives the idea that the military occupancy was by appropriation instead *235 of contract. Nevertheless, possession bad been taken by military force immediately after the capture of the city; the entry had been without the assent or assistance of the owner; no promise had been made, and no assurance had been given on the part of the Government. These facts seem to the court to form the foundation upon which its jurisdictional authority, if it exist, must rest.
There are three cases in which the subject-matter is almost identical with that of the present action-Bishop & Wescott’s (4 C. Cls., 448), Filor’s (9 Wall. R., 43), and Neal’s (21 C. Cls. R., 240).
In the first of these the military forces of the United States had seized certain real property in Memphis, as in this case, immediately after the capture of the city, in June, 1862. The Government continued to occupy the property until March, 1668. In that year the owners brought their action to recover rent, not from the time of the taking, but from the 2d April, 1866, when the proclamation of the President declared the rebellion to have ended in Tennessee. It was held that this was a claim “ growing out of the appropriation of property by the Army” within the meaning of the Act 4th July, 1864 (13 Stat. L., 381), and thereby excluded from the jurisdiction of the court. The court acknowledged that the holding over after the Termination of the rebellion might be a taking of private property for public use, that the owners might have a valid claim for just compensation, but, nevertheless, if the occupancy resulted from an entry made by the Army during the war, the claim for rent was a claim “ growing out of the appropriation” of property.
A difference between that case and the present, favorable to this one, should be noted, that the owners were never recognized as landlord by the Quartermaster Department; and another, in which the former case was much stronger than the present one, that the claim was limited to rent subsequent to the ending’ of the rebellion.
In the case of Filor (9 Wall. R., 45), an assistant quartermaster entered into a lease for property in Florida. The lease was submitted to the Quartermaster-General, who neither approved nor disapproved it. The defendants continued to occupy the property from the beginning of 1862 to the end of 1866, and the owner then brought his action upon the lease.
*236 The language of the Supreme Court in the decision of that ‘case is very broad, but it must of course be understood as referring to the subject which the court was then considering. When the opinion says that “ no lease of the premises for the use of the Quartermaster Department could be binding upon the Government until approved by the Quartermaster-General,” the language must be understood as referring to leases made by assistant quartermasters, or other inferior officers, of buildings in enemy’s territory. There was no statutory authority which expressly conferred power on the Quartermaster-General to bind the Government by entering into express agreements for the occupancy of real property, and there was no statutory restriction or regulation which forbade the officers of the Departmentfrom procuring necessary quarters, hospitals, storehouses, stables, and other buildings for the use of the' Army by express contracts. Moreover, if the'transaction had been in time of peace the owner might have recovered on the implied contract, though the express contract of the agent was ultra vires and void' (Clark v. United States, 95 U. S. R., 539.)
The Supreme Court undoubtedly regarded the Quartermaster-General (the head of theBureau charged with procuring quarters for the Army) as speaking for the Secretary of War and the Secretary of War as speaking for the President. In other words, the court held that the Quartermaster-General was the Government, and that until the Government authorized an express contract with an enemy, in enemy’s territory for enemy’s property, none could be made and none could be implied. It followed, of course, that property so taken must be regarded as “ appropriated” by the Army, and so excluded from the jurisdiction of this court by the expr.-ss terms of the act.
It will be noted in this case of Filor that the occupancy of the property by the Government continued until the end of the of the year 1866, a period of nine months after the proclamation, April 2d, 1866, had brought the insurrection in Florida absolutely to an end. The point was not made by the counsel that there was a clear case of the taking of private property for public use in time of peace for which no compensation whatever had been made, and this distinguishing fact may have escaped the attention of the court, but as the case stands on the record the decision of the Supreme Court is an affirmanceol *237 the decision in Bishop & Wescott that such a claim is one growing out of an appropriation of property.
The question in Neal (21 C. Cls. R., 240) was one of jurisdiction under another statute. Neither the legal rights of the party neither validity of a contract was involved in the decision. The counsel for the claimant has cited the case of Hefflebower (21 C. Cls. R., 228), of which the case of Neal was a sequel, as an authority to support the validity of the implied lease and the owner’s right to recover. But in neither Hefflebower nor Neal was there such a question involved or such a point decided. Both of those cases came into this court under the Bowman Act, and the duty of the court was little more than that of a jury — the finding of the facts for the future consideration of Congress. The decision was strictly upon the subject of jurisdiction, upon the power of the court to proceed and find the facts, and not upon the rights of the parties.
Congress had inhibited the court from exercising jurisdiction territorially. The term used to designate this excluded territory was neither “ the seceded States,” nor “ States'or parts of States declared in insurrection,” nor “ places where the rebel force or organization held sway,” nor any term which had been used in previous statutes or in the proclamation of the President or in the decisions of the courts, but a new and perplexing term — “ the seat of war.” It could not refer merely to those losses which are known as the ravages of war, for the same sentence likewise excluded from jurisdiction “ destruction or damage to property ” by the Army or Navy, in military operations. It could not mean the insurrectionary States, for the term significantly ignored political and geographical boundaries. If actual conflict was the criterion, then endless questions must arise. Did territory cease to be a “seat of war” when the conflict ended ? Was Gettysburg “ the seat of war” a year before the greatest battle of the rebellion was fought or a year afterward9 Was the city of New York “the seat of war” when an attempt was made to burn it, or the State of Vermont when a raid was made across its border ? How was it possible to define, judicially, the boundaries of a battlefield or the geographical limits of military operations'? Was all hostile territory to be favored except the few spots where the opposing forces actually confronted each other ? The purpose of those decisions was primarily to deal with such questions as *238 these, and ultimately to demonstrate that “the seat of war” meant such parts of the insurrectionary district as the President from time to time might designate as enemy’s territory. Hence the decision of the court that where the occupancy of a building in Memphis began during a period when the President had, apparently, withdrawn the State of Tennessee from its previous status of hostile territory the fact might be reported to Congress. But the decision determined no question of legal right, and related strictly to the judicial construction of another statute, and can not be cited as an authority in the present case.
So much of the Act July 4,18G4, as relates to the jurisdiction of this court has been reenacted by the Act to Correct Errors and to Supply Omissions in the Revised Statutes (18 Stat. L., 316); and the foregoing decisions in Bishop & Wescott and Filor are consequently decisive of the present case, unless it be taken out of the prohibitive act by some subsequent legislation, which will now be considered.
The Act to Provide for the Bringing of Suits against the Government of the United States, 1887 (24 Stat. L., 505), popularly known as the Tucker Act, declares that this court “shall have jurisdiction to hear and determine the following matters” — first of which are “ all claims founded upon the Constitution of the United States.” This subject of jurisdiction is entirely new.
The reason of its enactment at that time may be found in some preceding judicial decisions, and an examination of them will assist in ascertaining and measuring the legislative purpose of this grant of jurisdiction.
In the three cases of Johnson (2 C. Cls. R., 391; 4 id., 248; 8 id., 243) this court had held:
“ Ejectment as a possessory action does not lie against the Government, for the Government always has ‘ the right of possession,’ founded either on ‘ aright of property’ or on its right of eminent domain. But wTien, in an action in the nature of ejectment, the ‘ claimant’s right of property ’ is established, the Government will be deemed to have entered as his tenant under an implied lease, whereof the ‘■just compensation’ secured by the Constitution to those whose property is taken for public use is the rent.” (Syllabus, 4 C. Cls. R., 248.)
An appeal was taken by the Government in the first case, but on consideration was abandoned by the Attorney-General. *239 In neither the second nor third was there an appeal, and the principle enunciated was regarded as settled until it was overruled by the Supreme Court in the case of Langford (101 U. S. R., 341), where it was held that the statute conferring a general jurisdiction of cases arising on contract, express or implied, refers only to contracts known to the common law, and not to the broader obligation of the Constitution, to make just compensation for private property taken for public use. The court added:
“ It is to be regretted that Congress has made no provision by any general law for aseertaining and paying this just compensation
The decision in Langford awakened no general interest, but the subsequent decision in United States v. Lee (106 U. S. R., 196), did.
In that case, as in Johnson’s, the Government had entered upon the property by military force, and as in Johnson, claimed to hold it by a title of its own. If the principle of the Johnson case had ¡igpiaiued undisturbed, the title might have been tried and the value of the property determined by a simple action in this court. But the owner of Arlington was compiled to resort to the circuitous course of bringing an action in ejectment against the agents of the Government in possession, npminally to oust them from property which the Government by its highest executive authority, and with the recognition of repeated appropriation acts, was holding, and intended to hold, and confessedly would continue to hold, for public purposes. The circuitous method for enforcing one of the plainest mandates of the Constitution, without which the property of every citizen would be at the mercy of every public officer, did not commend itself to Congress, and it doubtless brought to mind the declaration of the Supreme Court in Langford:
“ It is to be regretted that Congress has made no provision by any general law for ascertaining and paying this just compensation.”
Accordingly the eminent lawyer whose name has become affixed to the act of 1887 gave to the subject of suits against the Government most careful study, and ultimately, as chairman of the Judiciary Committee of the House of Representatives, succeeded in procuring an enactment which authoritatively makes the constitutional obligations of the Government to the citizen a subject of jurisdiction, irrespective of the technical rules and *240 refinements of the common law, or of the ambiguities and uncertainties of statutory provisions and definitions. “ That the Court of Claims shall have jurisdiction to hear and determine ” “ all claims founded upon the Constitution oftlie United States” is as comprehensive and untrammeled a grant of judicial authority as the legislative power could well make; and it must now be regarded as settled, that whenever a citizen is entitled to “ compensation ” by virtue of the express terms of the Constitution ho may recover it by a suit against the G-overument.
This grant of jurisdiction presents the resulting question whether such claims as the one now before the court are claims “ founded upon the Constitution.”
It has been held in an unbroken series of decisions (from the Prize Cases, in 1 Black’s Reports to Young, assignee of Collie, in 97 U. S. Reports) that the civil war in ali hostile operations must be regarded as international, and that “all property within enemy’s territory is in law enemy’s property, just as all persons in the same territory are enemies” (Chief Justice Waite, 97 U. S. R., 60). When the United States accorded to the Confederate States the rights of a belligerent they became a hostile power and their inhabitants public enemies. The obligations of the Constitution do not extend across military lines nor into hostile territory. The law which governed the transactions of the civil war was not constitutional law, but international. It has been closly adhered to; so closely, that under the decisions of the court of last resort the loyal citizens of the Rorth were practically excluded from the benefits of t]¿e Captured Property Act, and after nonintercourse began could do nothing to save their property in the South from Confederate confiscation; and though they acted in good faith, with no purpose to aid the rebellion^ seeking simply to save their own property in the South by directing its investment there — sending nothing into the insurgent districts and bringing nothing out, but leaving the resources of the rebellion precisely as they found them — their acts were held to be intercourse between enemies, and the investments of their agents illegal and void. (Grossmeyer’s Case (9 Wall. R., 72); Dillon (5 C. Cls. R., 586. Affirmed without opinion); Cutner (17 Wall. R., 617); Lapene (id., 601); Montgomery (16 id., 395); Stoddart (6 id., 340).
The period for which the claimant seeks to recover rent began and ended before the proclamation, April 2,1866, declared the *241 rebellion in Tennessee at an end. The case therefore does not present the question which was presented by that of Bishop & Wescott and which might have been presented by the case of Filor. It is not, in the opinion of the court, founded upon a constitutional obligation; it does not rest upon an express agreement of the Government, or pledge or assurance or declared public policy. The refusal of the deputy quartermaster-general to contract was not a contract, though his reason for refusing may have been a bad one. The claim does not grow out of obligations or agreements or pledges of public faith, but out of military exigencies occurring in a time of war on hostile territory. It is one of those claims “ commonly known as ‘ war claims,’” and as such expressly excluded from our jurisdiction by the statute, which is relied upon as confirming it. (Tucker Act, § 1).
For the purposes of an appeal judgment will be entered in the usual form, that the petition be dismissed for want of jurisdiction. If the claimant applies within the time prescribed by law an appeal will be allowed; if no appeal be taken, the judgment so entered may be vacated and the case, transmitted under the Bowman Act, be dismissed for want of jurisdiction under the decision in the Overton Hotel Co. Case (23 C. Cls. R., 186), and so reported to Congress.