Peelle, J.,
delivered the opinion of the court:
This is a Congressional case referred here by the Committee on War Claims of the House of Bepresentatives, on the 12th *58 day of February, 1887, under tbe act of March 3, 1883, Oh. 116, known as the Bowman Act. (Supp. to B. S., 2d ed., p. 403.) The claimant in her petition avers:
“That she is a citizen of the United States residing in West Feliciana Parish, State of Louisiana, where decedent resided during the late war of the rebellion; that at different times during said period the United States forces, by proper authority, took from the decedent quartermaster stores and commissary supplies of the value of $169,300, and appropriated the same to the use of the U. S. Army, as follows:
“ Taken by the United States forces for their use, between the town of Bayou Sara and Port Hudson, in the parish of West Feliciana, Louisiana:
1 steamboat, named Eed Chief No. 1, of about 175 tons burden, taken by Gen. Banks' army July 8, 1863, and turned over to S. P. Hollabird’s charge, quartermaster, Department of the Gulf, valued at..$35,000.00
For use of the steamer Eed Chief No. 1, for tackle, apparel, furniture, for 834 days, at $150 per day, making. 125,100.00
160,100.00
Credited by amount for -which said steamer Eed Chief No. 1 was sold by the United States, at Mobile, Ala., October 20, 1866, said amount being paid to the claimant on the day of March, 1866, by Quartermaster General M. C. Meigs on the order of the Hon. Edwin M. Stanton, Secretary of War. 7, 000.00
60 hogsheads of sugar, weighing 1,200 pounds per hogshead, 60,000 pounds, at25 cents per pound. 15,000.00
60 barrels of molasses, 40 gallons per barrel, 2,400 gallons, at 50 cents.-. 1,200.00
Aggregating in value. 169,300.00”
The court on a preliminary hearing on the 11th day of April, 1892, found that Samuel N. White, from whom it is alleged in the petition that said vessel and stores and supplies were taken, was loyal to the Government of the United States throughout the war for the suppression of the rebellion.
The contention of the defendants is that the claim comes within the provisions of the act of March 12,1863, (12 Stat. L., 820), known as the abandoned and captured property act; and that the claimant having failed to present his claim to this court within two years from the date of the suppression of the rebellion as prescribed by that act, the claim is barred; and further, that as to the steamboat the claim is barred by reason of the claimant’s having received the proceeds of the sale of said vessel and accepted the same in full of his claim therefor, without protest or objection, as shown further along.
*59 Tbe evidence as to the sugar and molasses seized shows that late in the summer or early in autumn of 1862 the military or naval forces of the United States seized and took a flatboat at Bayou Sara, La., upon which was loaded 50 hogsheads containing 50,000 pounds of sugar and 60 barrels containing 2,400 gallons of molasses belonging to said Samuel N. White (now deceased). Said sugar and molasses were loaded on a Navy or Army transport on the Mississippi Biver, and it does not further appear what became of it or whether said sugar and molasses were issued to or used by the Army or Navy as stores or supplies, or whether destroyed as an act of war, or whether the same came to the official custody of- the chief quartermaster of the Department of New Orleans or the chief commissary of the same.
If the property of a citizen, loyal or disloyal, in friendly or hostile territory during the war for the suppression of the rebellion, was destroyed by the Army or Navy of the United States, this court is inhibited from taking jurisdiction under the third section of the act under which this claim was transmitted to the court.
While the court, however, is inhibited from taking jurisdiction in cases of destruction or damage to property, a claim may arise from such destruction or damage which the court under the act would be authorized to investigate and report the facts to Congress, as, for instance, a building may have been destroyed or damagedfor whichno claim could arise within the jurisdiction of the court under said act, and yet if the lumber therein was used by the United States, the value of such lumber so used would constitute a claim for the court’s investigation and report, but that is not this case, for there is an entire absence of proof here as to the purpose of the seizure or what became of the property. True, the evidence shows that the property was seized, but it was seized in hostile territory which the Army and Navy of the United States were at the time seeking to enter and occupy.
If the property of loyal citizens was seized and the proceeds thereof paid into the Treasury under the act of March 3,1863 (12 Stat. L., 820), known as the captured and abandoned property act, the claimant’s remedy was under that act within two years from the time of the suppression of the rebellion as therein prescribed, and this court would be without jurisdic *60 tion of such claim under section 3 of tbe act of March. 3,1883, supra, which provides “Nor shall the said court have jurisdiction of any claim against the United States which is now barred by virtue of the provisions of any law of the United States,” and we take it and so hold the law to be that, where property was seized, as in this case, in hostile territory, as that portion of Louisiana was at the time of such seizure, and there is no evidence showing or tending to show, as there is not in this case, that such property was used by the Army or Navy of the United States as stores or supplies or other benefit derived therefrom to the United Stated, the presumption is that such seizure was not an appropriation for the use of the Army or Navy of the United States within the meaning of the fourth section of said act of March 3,1883, supra, but was a destruction of property as an act of war, and this court, under the first clause of section 3 of said act, is without jurisdiction to ascertain and report the facts to Congress.
As to the claim for the steamboat Red Chief No. 1, the evidence shows that early in March, 1863, the said Samuel N. White (now deceased) purchased at Shreveport, La., a steamboat named Red Chief No. 1, and that within' a day or two after said purchase a squad of Confederate soldiers under the command of a Confederate quartermaster impressed said boat into the Confederate service to transport stores and supplies to and for the use of the Confederate Army; that to preserve said boat said White remained on board said vessel and commanded her under the orders of said quartermaster in the transportation of stores and supplies as aforsaid. On or about the 1st day of July, 1863, said vessel was, in some informal-way, turned over to said White who ran her up Thompson Creek, leaving her in charge of a sufficient crew to protect her. The evidence shows that prior to the purchase of said vessel by White she was in the service of the Confederate Army under the command of her then owner, Capt. M. N. Wood, in the transportation of Confederate soldiers and supplies to and for the use of the Confederate Army.
On-the 8th day of July, 1863, at the time of the fall of Port Hudson, said vessel was found tied up in Thompson Greek, a few miles from Port Hudson, where she was seized by the United States forces and turned over to the chief quartermaster of the Department of the Gulf, of the United States Army, *61 as property captured from tbe enemy in war; and said vessel was thereafter used by tbe United States Army as property so captured.
On tbe 3d day of June, 1864, tbe said White filed in tlieDistrict Court of tbe United States for tbe eastern district of Louisiana a certain libel against tbe said steamboat Bed Chief No. 1, and S. B. Hollabird, then chief quartermaster, Department of tbe Gulf as aforesaid, alleging bis loyalty to tbe United States and claiming to be tbe owner of said vessel and demanding demur-rage fortbeusetbereof, and after tbe service of a proper warrant and monition, tbe United States, acting through tbe district attorney in said district, filed its certain bill of intervention, in which it was averred in substance, among other things, that said steamboat bad been captured by tbe naval and military forces of tbe United States at Port Hudson on tbe 8th day of July, 1863, from tbe rebels in arms, and that said boat was so held and belonged to tbe United States under tbe provisions of tbe act of July 13, 1861, entitled “An' act further to provide for tbe collection of duties on imports and for other purposes” (12 Stat. L., 255), and particularly by reason of tbe provisions of sections 5 and 6 of said act, and the proclamations of tbe President issued on tbe 15th day of April and tbe 16th day of August, 1861 (12 Stat. L., appendix, 1256 and 1262 respectively), and that tbe citizens of Louisiana were at tbe time of such capture in a state of insurrection.
Said case came on for trial, judgment, and decree, and tbe court found for tbe libellant, and gave judgment and decree of restitution, “leaving tbe question of demurrage untouched.” From which judgment and decree tbe United States, through tbe district attorney, filed its petition for a suspension appeal to tbe Circuit Court for said district, which appeal was granted to operate as a supersedeas as prayed, but there being no circuit judge there at that time, as appears, said cause was not tried or otherwise disposed of, but appears still to be pending-in said court. Thereafter, and from tbe time of tbe capture of said vessel as aforesaid, she was held and used in tbe service of tbe United States as captured property theretofore in tbe service of tbe Confederate army, until on or about October 12, 1865, when said vessel was sold to tbe highest bidder, as the property of tbe United States, by tbe Quartermaster Department of said Army, at Mobile, Ala., at public auction, having *62 first caused said property to be appraised and given notice of such, sale, for $7,000, which sum was $2,000 in excess of such ap-praisement.
Soon thereafter, and before said money was paid into the Treasury of the United States, said White made application to the Secretary of War, in which he asked the Secretary to “ direct the return to him of the proceeds of his vessel, and that such allowance be made to him for her use that, added to the amount for which the vessel was sold, will reimburse him for her value at the time of seizure;” but the Secretary at first refused to do so, claiming that said vessel was the property of the United' States by reason of capture in war, and that said White was not entitled to the proceeds of such vessel, but on the 14th day of March, 1866, after the Secretary of War had examined a certified copy of the proceedings and judgment in the said district court of Louisiana, he ordered said sum of money to be paid over to said White, in these words:
“War Department, March 14, 1866.
“It appearing from the papers in the case that the claimant, S. N. White, is a loyal citizen of the United States, and owner of the steamboat Eed Chief No. 1, and that she came by capture into the possession of the Quartermaster’s Department, in the Department of Louisiana, and that on a suit brought by White in the United State District Court against Quartermaster Hol-labird, the court decided in favor of the claimant, and ordered the boat to be delivered to him, and that pending that proceeding the boat was sold at Mobile by the Quartermaster Department by mistake, it is ordered the proceeds of the sale be turned over by the Quartermaster-General to the claimant in lieu of the boat, taking from Mr. White a release of all further claims against the United States for said boat, and its value, and an acknowledgment that the said sum is received in full accord and satisfaction for all claims against the United States or its officers for said boat and its value March 14, 1866.
“Edwin M. Stanton,
“ Secretary of War.”
Thereafter on the 16th day of March, 1866, in compliance with said order, said sum of money was paid over to said White upon a proper voucher made therefor, duly certified as required by said order and receipted for by said White, which voucher, certificate, and receipt are in these words:
*63 “Mo. 22.
“The United, States, to S, V. White, Dr.
“ Maroli 16.1866. To reimbursement of the proceeds of the sale of the steamer Ked Chief, Mo. 1, by the U. S. Qr. Mr. Dept., at Mobile, Alabama, on. the 12th of Oct., 1865, it being at the time the property of this said Samuel N. White, which reimbursement is in lieu of the boat, and in fall payment and release for all claims, by said Samuel N. White, on the U. S. Government or its officers, on account of said boat, and this said reimbursement ' being in full accord and satisfaction for all claims against the U. S. and its officers for said boat or its value’... $7,000
“ See subvouchers attached — two in number, as furnished from Qr. Mr. Gen’l’s office, March 16th, 1866.
“ I certify that the above account is correct and that it has been made in triplicate, and read over carefully to the claimant, Samuel N. White, in the presence of the attesting witnesses, and that he, in their presence, accepted the sum of seven thousand dollars, in fall of all claims by him against the IT. S. or its officers, on account of the steamer Red Chief, No. 1.
“ J. C. M. Ferran,
“Major, Qr. Mr., Brt. Gol., 77. 8. A.
“Received at Washington, D. C., the 16th of March,1866, of Brt. Col. J. O. M. Ferran, quartermaster, United States Army, the sum of seven thousand dollars, and-cents, in full of the above account in check No. 26, on the 1st National Bank of Washington, D. C., payable to S. N. White or bearer, for $7,000.00.
“ S. N. White.
“Witnesses:
“ W. M. Macrae.
“ C. A. THORN.
“ (Triplicate.) ”
We will not stop to question the jurisdiction of the District Court of Louisiana to render a decree of restitution in said case, as against the United States, after its bill of intervention had been filed, in response to a monition served on the chief quartermaster, setting forth that said vessel was held as the property of the United States by reason of capture from the enemy in war, as by said bill of intervention it was disclosed that the action, if action at all, was against the United States, over which the District Court had no jurisdiction, but whether that proceeding was valid or whether the Secretary of War had authority to order said sum to be paid to claimant is immaterial now to inquire, since payment was made on the condition stated in the order of the Secretary, and the claimant *64 accepted tlie same in full without protest or objection, and it is not for him to object that the Secretary of War illegally or mistakenly paid him a sum of money which belonged to the United States. (United States v. Adams, 7 Wall., 463; Comstocks Case, 9 C. Cls. R., 141; Belt's Case, 23 id., 317.)
The claim before the Secretary, as disclosed by the claimant’s application, was not only for the proceeds of the vessel, but for its use; and we think the payment made was intended by the Secretary, and so understood and accepted by the claimant, in full of his claim, and that being so the claim was barred at the time of the passage of the act of March 3, 1883. Besides, we remark that the claimant’s measure of. damages, if entitled to recover, would be only the value of the vessel at the time of capture, and such seems to have been the view taken by the claimant when he applied to the Secretary to have said sum, etc., paid to him. But if the proceeds of the sale had been paid into the Treasury and the claimant had commenced proceedings to recover the same under the abandoned and captured property act, his recovery, if at all, would have been limited to the fund in the Treasury, and he, by his application to the Secretary of War, having prevented payment of the funds into the Treasury, could not now enlarge his measure of damages; but, as we have said, for the reasons given, we are of the opinion that the claim was one barred at the time of the passage of the act of March 3,1883, supra, and that this court is, therefore, without jurisdiction. And being barred said act would not have the effect to revive the claim. (Ford’s Case, 19 C. Cls. R., 519.) The mere reference of a claim to this court under the Bowman Act does not give the court jurisdiction, for the last clause of section 3 of said act provides, "Nor shall the said court have jurisdiction of any claim against the United States which is now barred by virtue of the provisions of any law of the United States.” So, if a claim is barred, the court is inhibited from exercising jurisdiction. (Balmer’s Case, 26 C. Cls. R., 82; Dunbar’s Case, 19 id., 489.)
For the reasons given, the court is without jurisdiction to report the facts, and this opinion will be certified to Congress in lieu thereof.
The petition is therefore dismissed.
Davis, J., did not sit in this case, and took no part in the decision.