Drake, Oh. J.,
delivered the opinion of the court:
The Senate Committee on Claims transmitted to this court under the authority of the act of March 3, 1883, (22 Stat. L., 485,) commonly called the Bowman Act, the following Senate bill, No. 864, Forty-eighth Congress, 1st session:
“A BILL for the relief of William G. Ford, administrator of John G. Robinson, deceased.
uBe it enacted by the Senate and House of Representatives of the United States of America in Congress assembled, That the claim of William G-. Ford, administrator of John G. Robinson, de *521 ceased, for the interests of the American legatees of the said Eobinson, which were not provided for in the award of the Mixed Oomniission under the treaty of Washington of the date of September twenty-fourth, eighteen hundred and seventy-' three, be, and the same is hereby, referred to the Court of Claims, relieved from the bar of the statute of limitations; and the said Court of Claims is authorized to receive as evidence, at its discretion, the testimony already taken by said Mixed Commission in said-case, as though taken over again: and either party may take further and additional testimony, under the order and rules of the court, as in other cases:' Provided, That before final judgment shall be rendered by the court the said William G.' Ford shall duly execute, according to law, a new administration bond, in such penalty and with such sureties as the said ■court shall deem sufficient and approve.”
In conformity with the rules of this court the claimant filed a petition, as follows:
“ To the Honorable Court of Claims :
“ The petition of William G. Ford, administrator of John G. Eobinson, deceased, respectfully represents :
“ That he is a citizen of tfie United States and a resident of New York city; that John G. Eobinson, deceased, was born in England and a subject of Great Britain, and that during the late war of the rebellion he resided in New Orleans, Louisiana; that ■on or about March 7th, 1863, decedent purchased of Eobert B. Hurt, of Madison county, State of Tennessee, two hundred and thirty-eight bales of cotton, weighing five hundred pounds per bale, more or less, amounting to one hundred and nineteen thousand pounds, more or less, which was worth seventy-five cents per pound, amounting to eighty-eight thousand two hundred and sixty dollars, ($88,260.00,)-more or less; that said cotton was delivered to decedent at Ponchatoula, in the State of Louisiana, on or about the date last above stated; that said ■cotton was seized by the United States military authorities under command of Gen. Banks, and under the direction of the said authorities the same was sold in New Orleans and the proceeds thereof appropriated to the use and benefit of the United States Government.
“Your petitioner further represents, that his claim as administrator of the said John G. Eobinson, deceased, for the proceeds derived from the sale of said cotton as aforesaid, was on or about the 20th day of March, 1872, presented to the Honorable Mixed Commission on British and American Claims, under the 12th article of the treaty of May 8,1871, providing for the organization of the said Commission, and was by said Commission allowed to the extent only of the interest of Mary G. *522 Barker, she being the only surviving legatee under the will of the said John G-. Robinson, deceased, who was a British subject, and in the following language, to wit:
“ Newport, Rhode Island, September 24,1873.
“William Gf. Ford, Administrator, ) “ vs. > No. 328. “The United States. )
“We award the sum of twenty-nine thousand, six hundred and thirty-eight dollars to be paid in gold by the Government of the United States to the government other Britannic Majesty, m respect of so much of the above claim as relates to the interest of Mary G. Barker, or her representatives under the will of John G. Robinson, deceased, bearing date October 8, 1858.
(Signed) “ L. Corti,
“Russell Gurnet,
“ Commissioners.”
“That subsequently your petitioner, believing the said award to be unjust to the devisees under the will of the said John G. Robinson, deceased, who were citizens of the United States and not subjects of Great Britain, petitioned Congress for relief; that said petition was renewed before the 48th Congress, and on the 21st day of December, 1883, was referred to the Committee of Claims of the Senate, and by said committee was transmitted to your Honorable Court on the 30th day of April, 1884, in accordance with the provisions of section one of an act approved March 3, 1883, entitled ‘An act to afford assistance and relief to Congress and the executive departments in the investigation of claims and demands against the government.7
“Your petitioner further represents that the said John G. Robinson died in Biloxi, Miss., on or about August 25, 1869, to the best of his' knowledge and belief, and that he did not give any aid or comfort to the late rebellion, and that your petitioner was duly appointed administrator of said Robinson, deceased.
“And your petitioner further represents that there is justly due him from the United States, as administrator of the said John G. Robinson, deceased, the balance of the proceeds derived from the sale of said cotton after deducting the amount awarded as aforesaid to Mary G. Barker, the sum of sixty-six thousand one hundred and ninety-five dollars, and prays that your Honorable Court will proceed to find the facts as to this claim and report such finding to the Senate of the United States or to the Committee of Claims, as the said act of Congress provides.77
*523 ’ The Attorney-General moves to dismiss this petition, on the ground that jurisdiction of it is denied to this court by these words in section 3 of the Bowman Act:
“Nor shall the said court have jurisdiction of any claim against the United States which is now barred by virtue of the provisions of any law of the United States.”
The claim, as stated in the petition, is this: That on or about March 7,1863, the claimant’s intestate, at Poncbatoula, La., was the owner of 238 bales of cotton, worth $88,260; which were seized by the'United States military authorities under command of General Banks, and under the direction of said authorities the same were sold in New Orleans, and the proceeds thereof appropriated to the use and benefit of the United States government.
The claim as thus presented is one which, under' the Abandoned and captured property Act of March 12, 1863 (12 Stat. L. 820), might have been preferred in this court within two years after the suppression of the rebellion. The Supreme Court decided that the date of the suppression of the rebellion was August 20, 1866; and so the claim might have been brought here at any time between that day and the last moment of August 20,1868.
The provision of that act authorizing that recourse is as follows:
“ Any person claiming to have been the owner of any such abandoned or captured property may, at any time within two years after the suppression of the rebellion, prefer his claim to the proceeds thereof in the Court of Claims; and on proof to the satisfaction of said court of his ownership of said property, of his right to the proceeds thereof, and that he has never given any aid or comfort to the present rebellion, to receive the residue of such proceeds, after the deduction of any purchase-money which may have been paid, together with the expense of transportation and sale of said property, and any other lawful expenses attending the disposition thereof.”
The question presented in connection with this provision is,' whether, under the Bowman Act, this court may lawfully exercise any jurisdiction whatever in regard to this claim.
The first section of that act is as follows:
“Whenever a claim or matter is pending before any committee of t]ie Senate or House of Bepresentatives, or before either House of Congress, which involves the-investigation and deter *524 mination of facts, the committee or house may cause the same, with the vouchers, papers, proofs, and documents pertaining thereto, to be transmitted to the court of claims of the United States, and the same shall there be proceeded in under such rules as the court may adopt. When the, facts shall have been found, the court shall not enter judgment thereon, but shall report the same to the committee or to the house by which the case was transmitted for its consideration.”
From this it appears that the only jurisdiction we can exercise over any claim transmitted to us by a committee of either house of Congress is to find the facts and report them to the committee.
When, therefore, section 3 declares that we shall not have jurisdiction of any claim which is barred, it means that we shall not, as to such a claim, have authority even to find and report the facts. The manifest intention of that declaration is to prevent the first step in favor of a barred claim, and so keep out of Congress old and stale demands. It is the duty of this court not to attempt to overstep tlie limit thus assigned to its powers.
The point then is, whether the claim set up in the petition “is barred by virtue of the provisions of any law .of the United States.” This does not mean merely the provisions of any law of limitation, but of “ any law.” Nor does it mean any express law barring the claim in direct prohibitory terms, but “any law” which has the effect of barring it.
It was one of the incidents of the war of the rebellion that the military authorities of the United States should seize private property in the enemy’s country, particularly those descriptions of property upon which the rebel government placed its great relianee for obtaining the means of carrying on the war; among which, in the words of the Supreme Court, cotton “ was the foundation upon which the financial system of the rebellion was built.”
No inhabitant of the insurrectionary States could possibly assert in any forum a claim against the United States for his property so seized. If no statute should authorize such a recourse, then all private property captured in the enemy territory would be utterly lost to the owner thereof.
It would necessarily be that the property of citizens residing in that territory, but who were loyal to the Union, would be taken. For their benefit, and for that of no others, the act of March 12, 1863, was passed, giving them the privilege to come *525 into this court, and claim the proceeds of the sale of their property captured and sold during the war.
. Had that act granted that privilege, without specifying a time •within which a loyal man should prefer his claim here, there is no reason why he might not come here now, though more than twenty-one years had elapsed, as in the present case, since his property was captured and sold.
But the legislature saw fit to say that every such person must prefer his claim here “within two years after the suppression of the rebellion.” Attempts have been made to sue the United States here after the expiration of that time, and to charge them for the proceeds of captured property as on implied contract; but we did not hesitate to decide against them, and the Supreme Court affirmed our decision. (Haycraft’s Case, 8 C. Cls. R., 483; affirmed, 22 Wallace, 81; Green’s Case, 10 C. Cls. R., 466; Gooch’s Case, 15 ibid., 281.)
We have held, too — and our judgment was sustained by the Supreme Court — that the provision requiring a claim to be presented in this court within those two years was not a statute of limitation, but one prescribing a jurisdictional period; and that he who failed to come here within that period was wholly without recourse anywhere, at any time, in any way. (Kidd’s Case, 8 C. Cls. R., 259; Haycraft’s Case, ibid., 483; affirmed, 22 Wallace, 81.)
What then was the position of a loyal man in the insurrec-tionary States, whose property had been captured and sold, and what the position of the government toward him ? He had no shadow of lawful claim against the government before the act of March 12,1863, was passed; nor had he after that, except as that act gave it to him. The government voluntarily opened the door of this court and, in effect, said to him “You can come in at any time within two years after the suppression of the rebellion, but if you do not • enter within that time, the door will be shut, and you will be barred out.”
This, in homely illustration, is, in our view, the simple position of the case, and if it does not bar the claim of one who did not enter within the prescribed time, quite as effectually and inexorably as if the bar had been declared in the most express ■words, we confess our inability to discover why it does not. (Haycraft’s Case, 22 Wallace, 81.)
*526 We cannot believe that it was tbe intention of Congress, in tbe Bowman Act, to re-open our doors to demands of this description. With regard-to them the Bowman Act is silent, and its silence, is as forcible as an express prohibition. It simply leaves that dead, as to the government, which, when the act was passed, had been dead nearly fifteen years.
But it was urged that the Supreme Court held, in Erwin v. United States (97 U. S., 392), that a claim for proceeds of captured property, which had not been preferred here within the two years, was an asset, the title to which was capable of transmission, though not capable of judicial enforcement. But what bearing has that ruling on the present case ¶ None that we can ■see. The question of time was not in that case, for Erwin procured the passage of a special act of Congress authorizing him to sue here, without which he could not have done so. The •claimant in the present case may, among the assets of his intestate, have a very good and valid claim under the abandoned and captured property act, if it had been preferred in •due time; but unfortunately he has not got a special act passed authorizing him to prefer the claim here, and the Bowman Act does not authorize it.
It is sought, however, to find support for the claimant’s position, in the doctrine announced by the Supreme Court, that the government constituted itself a trustee of the proceeds of captured property, and that the trust is for the benefit of the former •owners of the property. Of course, we are familiar with that ruling, but we are quite at a loss to discover what bearing it has"' on the presen t question. The trust assumed by the government was created in the only way it could be — ^by statute, and to the •statute we must look for the terms of the trust; and in the forefront of the terms we find it declared that the trust is for those only who prefer their claims here within two years after the suppression of the rebellion. And so, no matter what the rights of the party may be, he is wholly outside of the trust if he failed to assert them here within that time. And the immovable character of the bar thus erected by Congress against all access to the trust .fund after that time, is strikingly shown by the fact, that while there probably cannot be found in England or America a statute of limitations which does not provide that it shall not run against persons laboring under certain disabili *527 ties to sue, there is no such provision in the Abandoned and captured property Act in favor of claimants under it.
The experience of this court in the course of the administration of that act suggests to us some additional reasons for supposing that Congress did not intend by the Bowman Act to re-open this tribunal to abandoned and captured property claims.
The Abandoned and captured property Act was a notice to every man whose property had been captured and sold, that he could follow its proceeds here, and, on making certain proofs, reclaim them. Is it not fairly presumable that if Congress intended to open this court again for such claims, they would give now as clear and broad and universal notice of the fact as was given in 1863? Indeed, after so great a lapse of time, would it not be unjust and unfair that any less notice should now be given than was then? We think it would; and we therefore decline to assume that the Bowman Act was intended to open a side door to this court, into which would come only such claimants as should happen to hear of it, and be able to get their claims referred to this court, by a committee. ■
Any such legislation as that would be entirely alien in spirit to the act of March 12, 1863, which gave'to all loyal men an equal right and an equal chance to come here. We have had before us claims of all sizes, from that of a poor negro for a single bale of cotton, to that of the rich man for thousands. If Congress should see fit to permit such claims to be again brought here, 4s it not reasonable to suppose that its legislation would be, at least, as unequivocal in terms and as enlarged in spirit as that of 1863?
Furthermore: a not uncommon occurrence, in cases under the Abandoned and captured property Act, was, that conflicting claims to the same proceeds were presented by parties, each of whom had sued here within the prescribed time. In such instances it was in the power of the court to hear all claims and adjudge all rights. But if one man may, under the Bowman Act, obtain a committee’s reference of his claim to this court, we must act on that claim alone, and find and report the facts, without any opportunity being afforded to adverse claimants, not informed of the proceedings, to be heard at all; and thus the real right of the matter might fail to be reached. If the fund is a trust, then every principle of equity *528 and justice requires that every one interested in the fund should have fair notice and full opportunity to assert and prove his rights, not only in his own favor, but against all opposing claimants.
Three questions will close what we have to say of this case:
Is it respectful to Congress to hold that under an act which they passed for the express purpose of relieving themselves of private claims, they have, in fact, ignorantly let in a flood of them, of a description never seen there before?
Is it becoming to ascribe to that body the purpose to assume the decision of these claims, under an act which does not so much as refer to, much less mention, them ?
Is it judicially fit that we should, by strained inference, seek to discover a peculiar and extraordinary jurisdiction which is not named, when the only time it ever before existed it was given in plain and express terms?
We answer each of these questions in the negative; and therefore, and also on the grounds previously stated, the motion to dismiss the petition for want of jurisdiction is sustained ; and it is ordered that a copy of this opinion be transmitted to the Senate Committee on Claims.