Howey, Judge,
dissenting:
The majority of the court refuse to take jurisdiction to hear any facts or to make findings and report same pursuant to the resolution of the Senate transmitting bill here for the investigation of this claim. The bill transmitted provides for the payment of the net proceeds received from the sale of certain cotton taken from the petitioner (and a number of others duly identified) by the military forces in 1863 and placed in the Treasury of the United States.
The question here is whether a claim arising under the act of March 12, 1863, is cognizable, for the purposes of an investigation, by this court under the Tucker Act. This is a very important question at this time, because the small proportion of owners and witnesses who survive the taking of their property forty odd years ago are advanced in years, and the uncertainties of life render it of vital importance that the necessary testimony still available be taken without delay.
The majority deny jurisdiction to report the facts without considering the proofs on file, and then, by the last paragraph of their opinion, proceed to take jurisdiction far enough to report conclusions on the merits under an amendment to section 14 of the Tucker Act (approved June 25, *575 1910, 36 Stats., 837), which gives the court the right to report “ such conclusions as shall be sufficient to inform Congress of the nature and character of the demand, either as a claim, legal or equitable, or as a gratuity against the United States.” Conclusions rest upon the law of a case and findings of fact based upon testimony. If there is no jurisdiction to hear the case, conclusions can not enter into a report. Jurisdiction is the power to hear and determine. If there be no power to hear, there is no power to determine — nothing to say but that the court is without jurisdiction. 'Any other kind of a report which embo dies conclusions under the amendment, supra, even by implication is premature and calculated to mislead Congress to the prejudice of a claimant who is refused a hearing on ,the merits. . How can a court report conclusions of fact when facts can not be considered for the want of jurisdiction ?
Long after the decision in Klein's case Chief Justice Waite said that the Supreme Court had “ often decided ” that the proceeds of all captured cotton was “ a trust for the benefit of such as should establish their claim to it.” 92 U. S., 651. The statute of limitations then intervened. But the proceeds of much captured cotton is in the Treasury yet. The United States can keep it there by refusing to waive the statute of limitations or by refusing to afford relief to a claimant after the report of this court on a proceeding instituted by one of the Houses of Congress under section 14 of the Tucker Act, even though the report shows that a claimant has established title to some part of the proceeds.
If in any investigation it shall be proven that the Confederate Government held actual title at the time of seizure of any lot of cotton, then as against any petitioner claiming the proceeds in the Treasury, the court must draw conclusions adverse to such a claimant and so report, always keeping in view the fact that the Avar, in legal contemplation, was not waged against the private rights and property of the individual citizen, but against the political status of the Confederate States. The necessity to adhere strictly to competent testimony will necessarily have the effect of defeating the claims of those asserting ownership in some cases and of overruling defenses in others.
*576 The bill and petition in the matter before us alleges that certain cotton was, in the year 1863, seized by the military authorities of the United States and taken from the possession of the owner “ and was in part, or all,” taken from the owner’s plantation in the vicinity of Natchez, Miss. That the cotton was shipped to Memphis, Tenn., and sold .under authority of the Government and the net proceeds paid into the Treasury, and remain there. Depositions are on file in support of the allegations of the pleading showing the amount realized from the sales.
The jurisdiction of the Court of Claims provided by the law of March 3, 1887, commonly known as the Tucker Act, 1 Supp. B.. S., 559, contemplates by section 1 four distinct classes of cases: (1) Those founded upon the Constitution or any law of Congress, except pension cases; (2) those founded upon a regulation of an executive department; (3) cases of contract, express or implied, with the Government; (4) actions for damages, liquidated or unliquidated, in cases not sounding in tort. The words “ not sounding in tort ” are in terms referable only to fourth class of cases. Dooley v. United States, 182 U. S., 222. Suits under the first section were authorized to be brought within six years after the right accrued. Final judgments rendered thereunder are appropriated for and paid like other judgments against the Government when rendered by other courts of the United States having jurisdiction.
Concurrent jurisdiction was conferred .upon the district and circuit courts of the United States up to $10,000, but there was no limit put upon the jurisdiction of the Court of Claims so far as amounts were concerned. The facilities afforded claimants, as well as to the Government, in the prosecution and defense of claims from the official records on file at the seat of Government have brought to this court most of the claims against the United States.
By section 2 claims pending in any of the executive departments involving controverted questions of fact or law were authorized to be transmitted to this court for findings of fact and conclusions of law. These findings and opinions go to the proper department “ for its guidance and action.”
*577 By section 14 of the Tucker Act the Court of Claims must “ afford assistance and relief to Congress * * * in the investigation of claims and demands against the Government.” That section provides:
“ That, whenever any bill, except for a pension, shall be pending in either House of Congress providing for the payment of a claim against the United States, legal or equitable, or for a grant, gift, or bounty to any person, the House in which such bill is pending may refer the same to the Court of Claims, who shall proceed with the same in accordance with the provisions of the act approved March third, eighteen hundred and eighty-three, entitled ‘An act to afford assistance and relief to Congress and the executive departments in the investigation of claims and demands against the Government,’ and report to such House the facts in the case and the amount, where the same can be liquidated, including any facts bearing upon the question whether there has been delay or laches in presenting such claim or applying for such grant, gift, or bounty, and any facts bearing upon the question whether the bar of any statute of limitation should be removed or which shall be claimed to excuse the claimant for not having resorted to any established legal remedy.”
The refusal to proceed rests in part upon the idea that jurisdiction under the Tucker Act and jurisdiction under any other law is inconsistent. This is a mistake. Section 13 of the Tucker Act recognizes that claims within the general jurisdiction of the court may be referred under the Bowman Act, which is much more restricted than the provisions of section 14 of the Tucker Act. Judgment may be rendered in such cases brought within six years after the right has accrued. If such a claim be referred under section 14, judgment could likewise be rendered under section 13, inasmuch as the procedure under the Bowman Act is by section 14 expressly applied to congressional references under the Tucker Act.
The judicial code in section 151 is a reenactment, with some amendments, of section 14 of the Tucker Act. There it is recognized that claims referred under it may be within the' general jurisdiction of the court, because it is directed that in such cases the court “ shall proceed ” to render judgment or decree thereon. So, if this claim were within the general *578 jurisdiction of the court, that fact would not destroy the jurisdiction under the Tucker Act, because the court is given power to render judgment.
From the foregoing it will be seen that the jurisdiction of this court is twofold :
(a) There is jurisdiction to render judgment upon the petition of claimant if the jurisdictional bar of six years has not precluded the right to enter judgment.
(b) There is jurisdiction to find the facts by congressional reference without reference to the bar of any previous statute.
But these two jurisdictions are linked together by—
(<?) The right to render judgment in cases coming to the court by congressional reference of the classes in which judgment can be rendered upon the claimant’s petition.
There is no conflict, but a complete and harmonious system whereby the court may, by the entry of final judgment in cases within the six years’ jurisdictional limit of time, end controversies by doing so and reporting to Congress the action had, and in those cases where judgment can not be entered (because of the bar) by making report to Congress in the form of findings of fact, with conclusions. Thus the Congress have entire relief from claims upon which the court is authorized to render judgment. But in claims where facts and conclusions only are transmitted Congress may appropriate or may not, at discretion, or make such reports the basis of general legislation for cases of a class.
We need not anticipate the provision of the judicial code to determine the present issue, because the new code is not yet in force. If we did, we would find that by section 151 there is a reenactment,, with some amendments, of section 14-of the Tucker Act, because that section directs that the court “ shall proceed ” to render judgment or decree in claims referred like those of general jurisdiction. In Lanier’s case, now pending in this court, it appears that the cotton was taken subsequent to June 1, 1865, and that claim is apparently within the class on which judgment may be entered under “An act to codify, revise, and amend the laws relating to the judiciary,” approved March 3, 1911, but effective after January 1,1912. But the probable right of that case for the *579 entry of judgment does not destroy tbe jurisdiction so that upon any bill referred for the payment of a cotton claim of an antecedent date this court may not investigate and report its proceedings to that House by which the bill has been or may be referred. The provision of section 151 antecedent to the proviso of the section requires the court to make an investigation and determination of facts, even though there be no established legal remedy. So the present case is within the jurisdiction.
The argument that the House which has referred a bill can be denied a report flies in the face of the plain language of the statute if the bill be for the payment of a claim or for the payment of a grant, gift, or bounty to any person, because the direction is “ for the investigation and determination of facts” by the Court of Claims. Mrs. White’s ease, 33 C. Cls., 368.
There is a difference between the power to “ adjudicate ” and the power to “ determine.” In the' noted case of Bur-clett v. Abbott, 4 East., 29, Lord Ellenborough drew the distinction when he informed the House of Lords that the word “ determine ” in an act was not used in the sense of “ adjudge.” He said, “ We can not determine that which is a question for your own consideration respecting your own privileges, but we will tell you what is the rule upon which we act in our courts.” In Griffin v. United States, 33 C. Cls. E., 228, a special jurisdictional act gave this court “ full jurisdiction and authority to hear and determine all questions of fact and law in the said claim and to take order in the premises and report to the House of Eepresentatives.” It was held that the language of the act forbade entry of judgment, notwithstanding all cases relating to the liability of the Government in all courts of the United States must be reported to Congress. .But the duty of investigating and reporting was positive.
In Irwin v. United States, 127 U. S., 125, a special act had provided “ for adjudication ” by this court “ according to law on the proofs presented, together with a report to Congress.” There the court held that the force of the phrase “ for adjudication according to law ” could not be satisfied by anything less than a formal, regular, and final judgment *580 of the judicial tribunal to which the matter had been submitted, acting upon the acknowledged principles of law applicable to the circumstances of the case.
Under the Bowman Act, in cases referred by Congress, this court never had jurisdiction to determine questions of law except such as became incident to the ascertainment and settlement of the facts. Dockery's case, 26 C. Cls. B.., 148.
Under the Tucker Act the court was equally without jurisdiction to determine the legal rights of the parties unless the subject matter of the litigation fell within section 13 of that act, where the court was authorized to render judgment as under the ordinary jurisdiction of the court, if the cause of action had been filed within six years.
From time to time since the foundation of the Government cases of wrong done the citizens have arisen, but no remedy furnished in the courts. But, as said in Gibbons v. United, States, 8 Wall., 269, Congress have wisely reserved the matter of wrong for their own determination. The misfeasance, laches, or unauthorized exercise of power by oificers and agents of the Government have generally been matters reserved to Congress upon such investigation as Congress directed.
Under this statement of what may be referred to this court are thousands of cases not within the general jurisdiction at any time in history; not within the Bowman Act; and not within the intent of any other act, general or special, except the provisions of section 14 of the Tucker Act.
The petition of right as practiced and observed in the administration of justice in England does not exist in this country. The English petition of right involved a resort for justice through the agencies of the Crown. The Supreme Court, in alluding to the petition of right as it existed abroad, has said that the process was as efficient in securing the rights of suitors against the Crown in all cases appropriate to judicial proceedings as that afforded by the law to the subjects of the King in legal controversies with each other. The late Mr. Justice Gray likened proceedings in this court as “the nearest analogy that our law afforded to the petition of right as it existed in England.”
*581 In theory the system provided for this court is admirable up to a certain point; that is, in the power to render judgment in certain cases. It is a deficient system, however, because of the limitations placed upon the power of affording relief for the misfeasances of officers and agents of the United States and the wrongs done in the name of the Government (where it alone receives the benefit) in certain other cases. Judicial remedies exist to enforce the fifth amendment of the Constitution where private property is taken for public use without just compensation, if it be for real estate. But the constitutional right of the owner rises just as high where an officer or agent of the Government takes the personal property of the citizen for public use. Sheltered behind that provision of the first section of the Tucker Act, judgment can not be rendered in actions for damages, liquidated or un-liquidated, “ sounding in tort.”
The failure to open the doors of the courts for the seizure of personal property for the use of the Government by officers and agents of the United States was in part the origin of section 14 of the Tucker Act. It is proper to add that confusion yet exists as to the meaning of the phrase “ sounding-in tort.”
For affording remedies for future wrongs able administrative minds must be left to deal with the subject. Something better can be perfected independent of the fourteenth section of the Tucker Act for claimants for bringing actions within a proper period of time.
Congressional references under section 14 involve investigations generally for old claims. Under cover of a statute designed to afford the citizen a remedy where generally no forum ever existed for the assertion of the demand or where, if a forum ever existed, the citizen co.uld not avail himself of the opportunity to prosecute, many referred claims fail for the want of proof. The opportunities for the prosecution and defense of belated claims become circumscribed. Under these circumstances the duty becomes imperative to take nothing for granted and to reject incompetent testimony. It is equally essential, not only for the interests of the Government, but for the ultimate interests of every meritorious *582 claimant, that stipulations of counsel for the admission of testimony found to be incompetent be refused. The following cases serve to show my meaning: Jones & Laughlin, 42 C. Cls., 178; Alleman, 43 ib., 144; Boschke, 44 ib., 387; Ayres, 44 ib., 48 (specially jurisdictional) ; State of West Virginia, 45 ib., 576. They also show the exercise of jurisdiction with the same regard to a Tucker Act proceeding dependent upon congressional action as under the general jurisdiction subject to appeal to the Supreme Court.
But no matter how old a demand may be, it is within the constitutional power of Congress to appropriate, if, in the judgment of those bodies, such claims be founded upon moral and honorable obligations and upon principles of right and justice. A few having the sanction of the Supreme Court as to “ the practice of Congress since the adoption of the Constitution” are the cases of Emerson v. Mall, 13 Pet., 409; United States v. Price, 116 U. S., 43; Williams v. Heard, 140 ib., 529; United States v. Realty Co., 163 ib., 441.
The right to an appropriation does not necessarily follow from a finding of this court under section 14 of the Tucker Act. That is a matter dependent entirely upon the legislative will.
Publicists and statesmen of eminence have denied the power of the Federal Government to take money from the Public Treasury to pay gratuities. Pensions, however, will always be recognized as exceptional. But none will deny that in the exercise of the power of the lawmaking body for making grants and paying largesses to individuals there is great danger of abuses of the power.
Honest minds have differed, and always will differ, as to what constitutes the moral obligation to bestow the bounty of the Government. Thus, in the case cited from 163 U. S., ante, an appropriation had been made to manufacturers and producers of sugar who had complied with the provisions of a previous act authorizing bounties. But these bounty provisions had been declared to be unconstitutional by the first Comptroller of the Treasury. The appropriation was upheld on the ground that the manufacturers and producers of the sugar had relied upon the validity of the act whilst manufacturing and producing the article promised by law as a *583 bounty for the manufacture and production. The Supreme Court said in that case that the decision of Congress as to what was moral and honorable as an obligation could rarely, if ever, be the subject of review by the courts. •
In the foregoing observations concerning deficiencies of the law relating to the collection of honest claims and debts (not based on express or implied contract) against the Government the primary object has been to show jurisdiction in the present case. The case at bar is one of those not based upon agreement. The Congress have provided the machinery in directing this court to investigate claims not dependent upon contract, as well as cases that are, and the court does so with the valuable assistance of a corps of Government attorneys, among whom are experienced men. Many claims investigated and reported by the court are paid through what is know in legislative parlance as omnibus claims bills.
Incidentally it may be said that the citizen with a debt not predicated upon contract has generally met with less consideration and been subjected to greater delay than those persistent enough to ask the bounty of the Government.
The act of March 8, 1883, 22 Stat., 485, commonly known as the Bowman Act, was found too narrow to afford that relief and assistance to Congress and the committees there which was expected of the act at the time of its passage. Section 14 of the act of March 3,1887, known as the Tucker Act, was an independent section brought about to remedy deficiencies of legislation for all kinds and classes of demands, so that the Court of Claims might be made to sub-serve permanently the double object of relieving Congress of functions properly belonging to courts and at the same time extend to citizens more speedy and ultimate relief in just claims judicially declared to be well founded in fact.
Great alarm existed soon after the passage of the Tucker Act (which found official expression in a report to Congress) because of the estimate that 8,000 war claims alone had been filed in the court. The statement estimated that upon the basis of amounts demanded in war-claim cases and tried early in their history such claims aggregated at least $400,000,000. (Attorney Gen.’s Bept., 1890.) The then Chief Justice, however, estimated that when the war claims *584 were all put together actual payments would probably not exceed $8,000,000. The results since that time have justified the estimate made by the former Chief Justice.
War claims, for stores and supplies taken for the use of the Army had their origin in the abandonment by the Government of the rule prescribed for our army of invasion into Mexico. The rule was then established that private property of the enemy’s people should, if used by our military forces, be paid for. This rule was adopted by the Germans in their invasion of France, where the invading army was obliged to subsist upon the country, but promptly paid for everything taken from the citizen for the use of the invading forces.
The death and disappearance of witnesses in the last 20 years leave but little for the court to consider in the Civil War claims yet to be reported.
It was not the purpose of Congress 25 years after the close of the war to discriminate between citizens. Section 14 of the Tucker Act was added to the law in 1887. Two years before representatives of different parties from all sections of the country provided for the payment of claims arising out of the spoliations of the French at the close of the eighteenth century upon American commerce. Millions have been paid to the sufferers along our seaboard under that act. This special legislation was followed by a class of about 11,000 cases from the far West, provided for under the Indian depredation act of 1891 (26 Stat., 851). Judgments have been rendered and paid in most of these last cases where a right of recovery has been shown to exist. The litigation under both these acts is nearly ended. Both acts were made special because the claims in and under both were founded on treaties; and in the last-named act on the early promises of the Government.
The Bowman Act having been found insufficient, this court early recognized the extent of new jurisdiction conferred by section 14 of the Tucker Act. Thus, in Dowdy v. United States, 26 C. Cls., 223, Nott, J. (afterwards Ch. J.), speaking for the court, said: ' •
“Under the Tucker Act any bill may be referred, except for a pension, and there is no other restriction upon the *585 jurisdiction of the court. A claim for the destruction of property by the Army, a claim for the occupation of real estate at the seat of war, a claim barred by a law of Congress, and a claim for quartermaster stores where the owner had given aid and comfort to the rebellion, are all within the jurisdiction of the court for the purpose of investigating and reporting the facts.”
In Duplantier v. United States, 27 C. Cls., 328, it was said that the Bowman Act was in the highest and broadest sense a remedial statute “ intended not only to give redress to the citizen in the prosecution of just claims against the Government, but to relieve Congress from the burden of judicial investigation of demands against the United States.” Deficiencies in the relief granted by the Bowman Act so operated upon Congress as to procure an enlargement of the jurisdiction by the enactment of section 14 of the Tucker Act for the benefit of the citizen whose claim was barred. .Incidentally, Congress desired relief for their legislative committees who were without facilities for taking testimony.
The evidence that the Bowman Act was insufficient is shown by numerous decisions of the court where barred claims were denied a hearing, Burke v. United States, 21 C. Cls. R., 317; McDonald v. Same, 21 ib., 319; McLemore v. Same, 21 ib., 327; and over cotton seized jurisdiction was denied in Ford v. United States, 19 C. Cls. R., 519; 116 U. S., 213. These and many other barred claims had been pressed upon Congress and had seemed to committees there to possess prima facie such validity as to warrant a judicial inquiry into their facts.
Long after the question was supposed to be settled and when Tucker Act references by Congress became numerous, an exception was attempted to be read into the statute. A majority of the court thought that the loyalty of a claimant was jurisdictional. But upon reconsideration this court said in Chieves v. United States, 42 C. Cls., 21:
“ The court has given careful consideration to the statute, as well as to all other statutes, bearing upon the investigation of claims within the court’s jurisdiction; the supposed intent of Congress with respect to the enactment under which the claim has been transmitted; the consequences to those bodies should we deny judicial investigation where apparently the *586 court is clothed with power to examine and cross-examine witnesses, thereby immediately and permanently throwing upon Congress the duty of proceeding, if at all, upon the ex parte statements of interested parties at the risk of fraud and imposition upon the Government.”
But the issue of loyalty was not the only matter discussed. Jurisdiction was considered fully, and the court further stated that there was a clear congressional intent by the Tucker Act to enlarge the jurisdiction for gratuities as well as claims which Congress could constitutionally pay. And it was further said:
“ The intent of Congress appears to be clear that no fre-vious act should be incorporated into section 14 to prevent an investigation.”
$ $ $ $ $
“ It seems evident that the intent of the act of 1887 was to grant the authority to refer any claim within the constitutional power of Congress to make an appropriation for the payment thereof.”
If any case was ever within the principle of stare decisis the Chieves case is, because—
(a) Its consideration was protracted over a long period and was of an unusually thorough character;
(5) The judgment and opinion were concurred in by all the judges, who are the same as those now sitting;
(c) The claim was for tobacco seized under the abandoned and captured property act of March 12, 1863, and was thus for property of the same class as this cotton for which the same, and no other, statutory remedy was provided;
(d) The decision on the jurisdiction was known to the Houses of Congress and was the basis of the action of the Senate in the reference of the pending bill and many other bills;
(e) A change of mind, after so great consideration, on a subject so peculiarly within the knowledge of this court can not fail to lessen the confidence of Congress and the public in the court’s methods and conclusions.
Since that time findings have been made in a case (No. 12268) for cotton sold by the military authorities and credited in the accounts of an Army quartermaster; in cases *587 (Nos. 11857 and 10917) for cotton used by tbe Army in fortifications where the ultimate destination did not appear; in cases (Nos. 12296 and 11404) for cotton taken by the Army; in cases (Nos. 10911 and 12200) for cotton destroyed by the Army; and in a case (No. 10294) for the value of a vessel condemned as prize.
And after establishing numerous other precedents the court finally declared in Hunt v. United States, 45 C. Cls., 578, that—
_ “ There are no words of limitation restricting the jurisdiction in such (Tucker Act) cases. If there were, the court could not find the facts so that Congress could apply the remedy which they might desire to apply.”
The majority, therefore, have not only directly overruled a carefully considered case involving the exact point involved here, but have departed radically from a repeatedly declared general principle in the construction of the Tucker Act. In doing this they proceed upon the idea that the abandoned and captured property act, 12 Stat., 820, provided such an exclusive and final remedy as to prevent any future inquiry or investigation of any kind. The opinion is sought to be fortified by references which do not sustain that contention.
Congress, by the act of 1868, 15 Stat., 243, undertook to regulate “ judicial proceedings in certain cases for the protection of officers and agents of the Government and for the better defense of the Treasury against unlawful claims.” The time for filing claims under the abandoned and captured property act had not then expired. But before the passage of the act many suits were pending against officers and agents of the Government for the proceeds of captured cotton. The object of the act of 1868 evidently was the prevention of suits against Government officers and agents. Payments were being made as the result of such suits. (See Dept. Cir. No. 4, 1900, Mis. Div.) Subsequently the Supreme Court held, in Lamar v. Browne, 92 U. S., 187, that neither the captors nor the special agents of the Treasury were liable in an action at law for anything by them done within the scope of their delegated powers, but that an owner of cotton must *588 look to the Government for indemnity. The abandoned and captured property act had been construed by the Treasury Department to be property “ seized or taken from hostile possession.” This did not mean private ownership of and in the citizen. This construction was repeated in subsequent Treasury regulations and was approved by the Supreme Court in Padelford's ease, 9 Wall., 531, as correct. Section 3 of the act of 1868 provided that “the remedy given in cases of seizure made under said act, by preferring claim in the Court of Claims, should be exclusive, precluding the owner of any property taken by agents of the Treasury Department as abandoned or captured property in virtue or under color of said act from suit at common law, or any other mode ’of redress whatever, before any court or tribunal other than said Gourt of Claims."
Then followed the provision that in all cases of pending 'suits in trespass, replevin, detinue, or other form of action pending, theretofore brought or thereafter brought against any person for or on account of private property taken by such person as an officer or agent of the United States, might be defended by such officer or agent if the act of taking was in the administration of one of the acts of Congress mentioned, and if a plea to that effect was sustained by proof such plea should be a complete and conclusive’ bar to any suit against the officer or agent coming into the possession of captured property.
Subsequently the Supreme Court, in United States v. Klein, 13 Wall., 142, explicitly said that it was—
“ For the Government itself to determine whether these (cotton) proceeds should be restored to the owner or not.”
The language of the act of 1868 related to the then existing power of the Court of Claims “ to adjudicate ” under the abandoned and captured property act. The effect of that act was to bring all cases of that character to the court having-exclusive jurisdiction under the act of 1863. The act of 1868 related at the time to the exclusive power of the court to enter judgment in all cases within the act of 1863 if sustained by proof of title and further proof showing that the proceeds of cotton seized by any agent or officer of the Gov- *589 eminent- had been paid into the Treasury. The proviso to the last section of the act of 1868 clearly establishes the purpose. The evident purpose was to affect remedies as they then existed.
In Haycraft v. United States, 22 Wall., 81, an effort was made to sustain an action for captured cotton within six years of the pardon of the disloyal owner, although after the two years’ limitation fixed in ¿he act of 1863. It was held that the act of 1863 was the only source of justiciable right or of remedy for the entry of judgment in such cases, and consequently that no petition could be filed except as therein provided.
The right to prosecute to final judgment was necessarily exclusive. By the decision in Klein?s case, supra, the right to sue and prosecute to judgment was construed to include all owners who, hostile at the time of the seizure of their cotton, subsequently became loyal, and who brought their suits within the period of limitation. The Supreme Court said in Klein's case, 13 Wall., 138:
“ That it was not the intention of Congress that the title to the proceeds (of cotton) should be divested absolutely out of the original owners of the property seems clear.
“ We have already seen that those articles which became by the simple fact of capture the property of the captor, as ordnance, munitions of war, and the like, or in which third parties acquired rights which might be made absolute by decree, as ships and other vessels captured as prize, were expressly excepted from.the operation of the act; and it is reasonable to infer that it was the purpose of Congress that the proceeds of the property for which the special provision of the act was made should go into the Treasury without change of ownership. Certainly such was the intention in respect to the property of loyal men. That the same intention prevailed in regard to the property of owners who, though then hostile, might subsequently become loyal, appears probable from the circumstance that no provision is anywhere made for confiscation of it, while there is no trace in the statute booh of intention to divest ownership of private property not excepted from the effect of this act otherwise them by proceedings for confiscation.
* • * ❖ ❖ *
(P. 142.) “We conclude, therefore, that the title to the proceeds of the property which came to the possession of the *590 Government by capture or abandonment, with the exceptions already noted, was in no case divested out of the original owner.”
Under the foregoing decision of the Supreme Court construing the abandoned and captured property act it appears that Congress never intended to confiscate cotton by the statute authorizing seizure. The ownership remained, with the exceptions stated, with the original owner. But all persons, loyal and disloyal, who did not pursue their remedies within two years after the close of the war (which period of closing was fixed in certain States April 2, 1866, and in certain other States August 20, 1866) were barred from the right to prosecute to judgment.
Statutes which fix a period of time for the bringing of suits against the United States relate generally to suits ending in judgment. Such statutes are not merely statutes of limitation for all such cases, but are jurisdictional in their nature. United States v. Wardell, 172 U. S., 52. The proposition that the abandoned and captured property act was so exclusive as to bar an investigation under any subsequent act of Congress authorizing an investigation would apply equally to an investigation of almost every suit brought under the first section of the Tucker Act, because the right of action is as exclusive under the one act as under the other. Both acts conferred the right of suit; both fixed the jurisdictional bar; both included the right of appeal— to the Government in all cases and to claimants up to a certain amount. Under neither act can this court exclude the belated suitor from his constitutional right of petition under a bill referred to the court for an investigation and a report to Congress.
Hence, when Congress exercised its power in 1887 to create a jurisdiction by means of congressional references broader than the Bowman Act, the legislative will was exercised to include classes of cases which, before the passage of the act, were excluded under other acts.
We have seen that Ford’s case was decided under the restricted Bowman Act. That act contained a limitation excluding claims “ barred ” by existing law. It thereby failed *591 to give the “ assistance and relief to Congress ” suggested by its title. The result was that “ barred ” claims were urged upon Congress continually until a more comprehensive system for every citizen and for aliens whose Governments had provided for the hearing of claims in foreign courts of citizens of the United States was created.
Among the classes of claims “ barred ” under the Bowman Act were claims for two classes of property seized by the Government during the progress of hostilities — stores and supplies taken by the Army for military use and cotton seized by Treasury agents and sold. In considering the Ford ease, 116 U. S., 213, the question turned upon the right of Congress to refer the demand under section 1859, Revised Statutes, far enough for the entry of a judgment, because it was said by the court:
“ It is unreasonable to suppose that Congress intended to invest one of its branches with authority to suspend a general statute of limitation. Every claim cognizable by the Court of Claims must be determined with reference to the limitation prescribed for claims of the class to which it belongs.”
Then followed the immediate statement that—
“ The Court of Claims has jurisdiction to hear and determine a claim referred to it by either House of Congress, because, and only because, the lawmaking power has so declared ; but unless Congress otherwise prescribes, that reference will not itself entitle the claimant to a judgment, if his claim is not well founded in law¡ or, when so referred, was barred by limitation. He acquires no new right by the reference except to demand that his claim be heard and determined by the court, just as would have been done had it been one of which the court could have taken cognizance by the voluntary suit of the claimant. Had he chosen, before going to Congress, to sue in the Court of Claims, he would have been confronted with the statute of limitations.”
Ford’s case was decided more than a year before the passage of the Tucker Act, and the latter act did not in itself remove the bar of the statute of limitations so as to create a waiver of the bar. But it did provide that after this court should have taken jurisdiction, as it was required to do, of any bill, except for a pension, it should investigate and re *592 port the facts, together with “ any facts bearing upon the question whether the bar of any statute of limitation should be removed or which shall be claimed to excuse the claimant for not having resorted to any established legal remedy.”
We know now the reason why persons who had not been loyal to the Government, but whose cotton was seized, did not prosecute their claims under the abandoned and captured property act. The Klein case had not been decided until after the time had expired for the blunging of suits in the Court of Claims under the original act, which the majority of the court now think was so exclusive as to bar claimants from the right to appeal to Congress for relief. This is substituting the will of the court for the discretion of the lawmaking power on that subject.
The case of Lamar v. McCulloch, 115 U. S., 163, was an action of trover brought against a former Secretary of the Treasury in a tribunal other than the Court of Claims. The defense was that the cause of action was barred. The Supreme Court disposed of the case by saying that the remedy in cases of seizure under the acts cited was exclusive, precluding the owner of any property taken “ from suit at common law, or other mode of redress whatever, before any court other than said Court of Claims.”
In Tucker Act references by either House, and where no judgment is authorized to be entered, investigations only can be had with reports to Congress. The act would be purposeless without investigations and findings, because there would be no necessity for claimants to ask the reference of claims not barred by the six years’ period of limitation, or some other statutory remedy or deficiency.
By the addition of section 14 to the Tucker Act it was the purpose of Congress to do two things: (1) To stop appropriations, as far as practicable, upon the ex parte statements of interested claimants; and (2) to curb the general appropriating power upon the recommendation of committees before whom, in the nature of things, testimony could not be heard as in courts and Government counsel could not appear.
In arriving at the effect of the decisions the chronology becomes important. The Bowman Act was approved March 3, 1883; the decision in the Ford case came May 26, 1884; *593 later decisions enforcing the bar began with Burke's case, 21 C. Cls., 217, May 3, 1886. On March 3, 1887, Congress enlarged the .scope of the court’s jurisdiction by expressly providing a judicial investigation of the facts in barred claims.
The only other decision relied upon against taking jurisdiction in the present claim is that in Vincent v. United, States, 39 C. Cls., 456. There the claim had been before this court under the Indian depredation act of March 3,1891, and rejected. A bill was introduced to pay “ his claim against the United States,” and referred under the Tucker Act. This court held that Vincent had no “ claim ” against the United States, and because the bill purported to refer a “ claim ” the court could not take jurisdiction. But we were careful to declare that the matter was not barred from consideration if the bill had been in such form as to provide in terms for a gift or grant, except a pension. The court expressly declared that—
“ The jurisdiction to report the facts would attach, otherwise not under the conditions set forth.”
Two important differences exist between Vincent’s case and the case ,at bar. Vincent’s claim had been presented to court under an act which gave Vincent his day in court. It had gone to an express adjudication to the effect that it was not a claim against the Government. The present claim has never been before presented to the Court of Claims under the act of March 12, 1863. It has, therefore, never been “ adjudicated.” It can not be “ adjudicated ” now. But it can be “ investigated ” under the act of March 3, 1887.
The present bill directs payment to be made, but whether for a claim legal or equitable, or for a grant, gift, or bounty, is not shown by the bill. The kind of a “ conclusion ” which under the amendment of June 25, 1910, 36 Stat., 837, the court may report, is a matter hereafter to be considered when the proofs are read and the case heard. But the question of jurisdiction is not involved.
But the Court of Claims was not satisfied with its ruling in Vincent’s case, as the court almost immediately overruled the decision by making findings of fact in Indian depredation *594 cases and reporting these findings to Congress under section 14 of the Tucker Act See Allman v. United States, No. 9999; McWorthy v. Same, No. 10003; Rogers v. Same, No. 10005; Thompson v. Same, No. 10006; Forsyth v. Same, No. 9982.
The jurisdiction of the Court of Claims has been shown to be made up of different and distinct jurisdictions involving different methods of procedure. And it must always be remembered that these different jurisdictions were not contemporaneous. It must further be understood that these different and distinct jurisdictions involve the power to render final judgments in many cases where there is no right of appeal, and in many others where there is a right of appeal to the Supreme Court of the United States; and that when these judgments become final they are appropriated for just as judgments rendered in other courts of the United States. There are numerous cases coming from the heads of the executive departments, not only for an ascertainment of facts, but for the court’s opinion on the law, “ for the guidance and action ” of the executive. There are other cases, wholly different in their nature, which go to Congress for the exercise of the political power according to what may seem right to the. legislative department. Intermingled with various general jurisdictional acts are numerous special jurisdictional statutes — some of these special acts directing the court to find the existence of titles, but providing for no appeal; and some directing a straight adjudication, leaving, from the uncertain phraseology, the matter of appeal to the Supreme Court in doubt. With this statement of the varied and complex character of the court’s jurisdictions, it is not easy to say that any one of a series of statutes with purposes so distinct has the effect of repealing other statutes imposing different requirements upon the court.
In Ex parte Crow Dog, 109 U. S., 556, the question was whether the District Court of Dakota Territory had jurisdiction in the case of a murder of one Indian by another. The act of 1854 had provided that the general laws of the United States as to the punishment of crime should extend to the Indian country, but not to crimes by one Indian against the person or property of another Indian. It was *595 contended that this exception in the act of 1854 had been repealed by a treaty between the United States and the Sioux Indians in a statute that “they shall be subject to the laws of the United States, and each individual shall be protected in his rights of property, person, and life.” The Supreme Court held that these words were not sufficient to repeal the provision of the act of 1854, excluding from the jurisdiction of the courts offenses committed by one Indian against another.
In Petri v. Creelman Lumber Co., 199 U. S., 487, the earlier of two acts under consideration was approved March 2, 1887, the latter on March 3, 1887. The act of March 2 was a special act to regulate the judicial districts in Illinois. It provided that if there were two or more defendants in the State residing in different districts the action could be brought in the district in which either of the defendants might reside. The act of March 3, 1887, was a general judiciary act and declared that no suits should thereafter be brought in a circuit or district court in any other district than that where the defendant was an inhabitant. The action was brought in accordance with the act of March 2, and it was contended that it was improperly brought because a different rule had been established by the act of March 3. The Supreme Court declared that the special act remained in force notwithstanding the passage of the general act the day following.
These cases have been cited as authorities for the position that the act of 1887 can not be construed by section 14 to affect the present matter of the abandoned and captured property act of 1863. The statement of the points decided in these cases is enough to show how remote is their analogy to the present question.
It is apparent for the purposes of the present case that the act of 1887 did not accomplish the repeal of the act of 1863. The act of 1863 gave a right to recover by action here the net proceeds of cotton in the Treasury. The limitation of two years on the presentation of demands to the Court of Claims upon which a judgment could be rendered is yet in force.
*596 The act of 1887 permits a House of Congress to secure the findings of this court in any claim pending before it. It is an enlarged statute which looks to an appropriation independent of formal judgment. It is a part of the new system by which this court makes findings of fact in claims which have had the attention of one House of Congress — but to be investigated and reported back to the House making the reference for the future consideration of the entire Congress.
The essential fallacy of the entire argument of the exclusiveness of the act of 1863 is that Congress in that year had no power to limit the action of any subsequent Congress over any subject. When Congress in 1887 passed a general act giving a new means for the investigation of facts in private claims, the’ extent of that remedy is not to be limited by any exclusive purpose supposed to be in the mind of Congress which sat in 1863.
The new act — in force next year — does not provide any remedy at all for cotton seized before June 1, 1865. Even if it did, the new act makes provision for the prosecution of any claim Congress have previously referred. All proceedings pending at the time of the taking effect of the new act may be prosecuted with the same effect as before. Sec. 299, chap. 14.
In a number of cases the courts have declared that all property in the seceding States was, during the war, enemy property subject alike to seizure under the laws of war whether its owner adhered to the Union or to the Confederate States, and that no redress existed for such seizures except such as might be provided by Congress. Mrs. Alexander's Cotton, 2 Wall., 418; Haycraft v. United States, 22 Wall., 96; Young v. Same, 97 U. S., 60; Ford v. Same, 19 C. Cls., 524; 116 U. S., 213; Welt v. Same, 20 C. Cls., 487.
While these decisions were made in cotton claims, the principle of law there declared includes equally those articles essential to the maintenance and support of the Army, generally classed as “ stores and supplies.” These were of primary value to military operations. Cotton was of secondary value and used as a basis for securing military supplies. No discrimination can be made between cotton and Army stores *597 and supplies which would have the effect of putting these articles on a substantially different basis.
The right of the United States to take cotton was equal to the right of the United States to take stores and supplies. When taken in enemy country all property so taken was equally enemy property if the captor chose to assert title. The question of payment rested equally and with any Congress in regard to bo'th classes of property.
Congress provided, first, for the preservation of the proceeds of cotton by the abandoned and captured property act of March 3,1863, and jurisdiction was given to the Court of Claims. Next it provided the Southern Claims Commission by the act of March 3, 1871, 16 Stat., 524, for the investigation of claims for stores and supplies. Two years were allowed for the presentation of claims as to both classes of property.
Cotton claims were barred by implication if not presented within that time. Claims for stores and supplies were barred by express provision of law at the end of a like period.
Claims for stores and supplies and claims for cotton were equally outside of the jurisdiction of this court under the Bowman Act, because both were barred. (See authorities supra.) But both classes of claims were equally within the jurisdiction of this court under the Tucker Act. Hundreds of findings have- been made by the court under the Tucker Act, including some of the cases dismissed under the Bowman Act, which settled the practice.
It is suggested that jurisdiction is not a matter of sympathy or favor. Certainly not. Neither should the limits put upon jurisdiction applicable to one set of cases exclude from consideration another set of cases of the same class.
Of course, jurisdiction for cases under section 14 of the Tucker Act can not be enlarged by one House of Congress, but when both Houses have said that one House may refer any bill for purposes of investigation jurisdiction attaches by law.
It is argued that section 14 of the act of 1887 “must be construed in the light of previous legislation and the decisions of -the Supreme Court and of this court in relation *598 thereto,” citing United States v. Pacific Railroad Co., 120 U. S., 227, 283; Ford v. Sarget (supra); Beaseley's case, 21 C. Cls., 225; Heflebower's case, 21 C. Cls., 228; Myer’s case, 22 C. Cls., 80; Conrad’s case, 25 C. Cls., 433. The cases cited were either under the Bowman Act or by suit where judgment was asked. They do not construe section 1%. of the act 1887 so as to put a limit upon Congress in the reference of cases by section 14 nor deny the power of the court to investigate for whatever result may follow.
Again, it is suggested that Congress have revived and applied the abandoned and captured property act by section 162 of the judicial code in so far as cotton was taken subsequent to June 1, 1865. But the judicial code is not in force as yet. Even if it were, section 299 of the new code provides that the repeal of existing laws embraced therein shall not affect any right accruing or accrued, or any suit or proceeding pending at the time the new code shall take effect. So, when the bill in the present case was transmitted for investigation; the right of the claimant to a hearing became fixed.
The owners of cotton were between two fires during the progress of the war. The Confederate Government was for a time impressing the staple and forcing subscriptions for its bonds with cotton as the basis, thereby securing a broader foundation for credit. At other times the Confederate military authorities were under orders to burn cotton, and were actually doing so to prevent it from falling into the possession of the Government. Meantime, the United States were seizing cotton products, sometimes for the use of the Army, but generally to sell and keep the proceeds in the Treasury. This statement does not include the appropriation of cotton for a nominal price by traders and camp followers, nor extend to acts of private depredation. If, as said by the Supreme Court, the proceeds of cotton captured from the owners went into the Treasury without change of ownership, and the title did not become divested, the proceeds continued to belong to all such owners as might be able to prove ownership. The statement in Klein’s case of the Supreme Court that confiscation as against private owners was never intended by the act authorizing seizures may be supplemented *599 by a reference to the fourth section of the original act, which did declare that all property coming into any of the United States not declared in insurrection from any of the States declared otherwise, through or by any person other than any agent appointed under the provisions of the act authorizing seizures or any lawful clearance by any proper official of the Treasury, did become subject to confiscation upon proceedings to be instituted.
The concern manifested for loyal persons under the new act for proceeds of cotton taken subsequent to June 1, 1885, is misplaced, because persons loyal to the Government had their day in court before the Supreme Court promulgated that construction of the law that cotton seized had not been confiscated and had not been intended by the abandoned and captured property act to be confiscated where the proceeds reached the Treasury. Doubtless most loyal men received from the Treasury money for the proceeds of cotton taken, from them.
The abandoned and captured property act provided for the recovery of the proceeds of property traced to the Treasury. Where ownership of a particular lot be established, such an owner may be reimbursed for the net proceeds without reference to claims of others for the proceeds of cotton they may have independently. Where a judgment can be rendered at all the act will likely prove disappointing to some owners, because some lots of cotton were sold for only enough to make the net proceeds amount to about $40 a bale. There were other lots of cotton sold for more than $200 a bale.
There are cases where the property of different owners became so intermingled in a common mass after capture as to compel the court to see that there would be a deficiency in the fund as between a number of such contemporary claimants. In Raymond v. United States, 92 U. S., 651, it was held to be proper for the court to bring all such claimants together to litigate with each other so that each claimant might share proportionately.
Mr. Chief Justice Waite held in Raymond's case (supra) that the proceeds in the Treasury constituted a trust for the benefit of such as should establish proper claim; that where *600 the property of each owner could not be traced the judgment would be against the common ownership of all, especially as the time had elapsed within which new claims could be presented against the fund. Any effort made now to marshal assets on the proceeds yet left in the Treasury, except as stated, would be attended with greater difficulty than ever, manifestly because the act authorizing judgment for cotton seized only after June 1, 1865, could not properly be administered so as to take the proceeds of cotton placed in the Treasury where the seizure was made before June 1, 1865. Any attempt to prorate the proceeds generally would extend the litigation beyond the lifetime of many of those in interest.
If this court adheres to the proposition that cases not provided for by the recent legislation (and which can not go to judgment because not provided for) can not be investigated under section 14 of the Tucker Act for a report to Congress, then the court should withdraw from the consideration of Congress the class case of Marshall v. United States, S. Doc. No. 70, 58th Cong., 3d sess, where the court took jurisdiction under that section, and which involved 2,300 other cases where the court is now taking jurisdiction. The jurisdiction in Marshall’s case was exclusive in the Secretary of War. Marshall sought relief in this court under the Bowman Act, but his petition was dismissed for want of power to hear the case upon the ground that jurisdiction was vested exclusively in the Secretary of War, who had denied the refunding of certain commutation money incident to exemption from service in the Army.
The test of the power of the court to deal with the present matter is the power of Congress to have the bill referred. The power has been exercised, and there seems to be nothing to do but to investigate and make the proper report according to law.
For the reasons that the language of the authority is too plain to need construction, that the precedents are too many to be recalled, and that the judicial action is too frequent to be set aside, I dissent from the reasons assigned by my brethren of the court for refusing to proceed. There is no need for further comment.